Billy George HUGHES, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 70504.

Court of Criminal Appeals of Texas.

April 13, 1994.

Certiorari Denied May 15, 1995.

See 115 S.Ct. 1967.

---

*OPINION*

MALONEY, Judge.

Appellant was convicted of capital murder, specifically murder of a peace officer. TEX.PENAL CODE ANN. § 19.03(a)(1). This cause originated in Austin County and was transferred to Matagorda County on change of venue.[1] At the punishment phase of trial, the jury answered the three issues submitted to it in the affirmative and the trial court assessed the death penalty. TEX.CODE CRIM. PROC.ANN. art. 37.071(b)(1), (2), (3). Appeal to this Court is automatic. TEX.CODE CRIM. PROC.ANN. art. 37.071(h).

Appellant raises fifty-five points of error.[2] Because appellant challenges the sufficiency of the evidence to support the jury's affirmative answers to the first two issues submitted

---

1. This cause was transferred prior to appellant's first trial in 1976. We affirmed appellant's first conviction on direct appeal, *Hughes v. State*, 563 S.W.2d 581 (Tex.Crim.App.1978), *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979), but reversed that conviction when we granted appellant relief on his habeas corpus application, *Ex parte Hughes*, 728 S.W.2d 372 (Tex.Crim.App.1987).

2. In his brief, filed on October 22, 1990 ("original brief"), appellant alleged violations of the Texas Constitution in 23 separate points of error. Those points were combined with virtually identical points of error alleging violations of like provisions in the federal constitution. However, appellant did not proffer argument or authority

as to the protection provided by the Texas Constitution or how that protection might differ from that provided by the United States Constitution. Accordingly, on October 13, 1992, this Court issued an Order directing appellant to file a supplemental brief providing argument and authority in support of his points of error alleging violations of the Texas Constitution. Appellant's supplemental brief repeats verbatim the 23 points of error from his original brief alleging violations of the Texas Constitution, and purports to provide argument and authority therefore. Any references to appellant's "brief" shall refer to both the original and supplemental briefs collectively.

to it at punishment, a review of the facts is necessary.

On the evening of April 4, 1976, appellant was pulled over by two Department of Public Safety (DPS) Troopers acting in response to a dispatcher's report which described appellant and his car.[3] The dispatcher's report was made pursuant to a report from a local motel where appellant had attempted to check in using a stolen credit card.[4] After appellant had pulled onto the side of the road, Trooper Mark Frederick approached the driver's side of appellant's vehicle. Trooper Jack Reichert, while getting out of the patrol car immediately thereafter and approaching appellant's vehicle behind Frederick, heard a muffled shot and saw Frederick lurch to the side. Reichert shot several times at appellant's car as it sped away. Frederick sustained a fatal wound in the shooting encounter.

A vehicle matching the description of the vehicle involved in the shooting incident and containing numerous bullet holes was reported abandoned several miles from the scene of the offense. Inventory of the car's trunk revealed a loaded, sawed off shotgun and numerous other weapons and ammunition.

The ensuing search for appellant took two and one-half days. Arriving by helicopter at a location where a suspect was reportedly sighted, law enforcement officers observed appellant under a tree. Appellant initially pointed his pistol at the helicopter operator, but later threw down his weapon and surrendered. The weapon discarded by appellant was subsequently identified by ballistics experts as the revolver responsible for the death of Trooper Frederick.

In points of error one and two appellant claims the evidence is insufficient under the eighth and fourteenth amendments to the United States Constitution, and under article one, sections thirteen and nineteen of the Texas Constitution, to support the jury's finding that the conduct causing the death of Trooper Frederick was committed deliberately.

A. Federal constitutional grounds

■ Appellant argues that Trooper Reichert's testimony and indeed the State's theory of the case is "ridiculous, absurd, and inherently incredible" and therefore a rational jury could not find beyond a reasonable doubt that appellant acted deliberately. Appellant argues that his own version of events is consistent with the evidence and according to his version, he did not fire at the deceased deliberately.

In reviewing sufficiency of the evidence on the first submitted issue,[5] we determine whether the evidence, viewed in the light most favorable to the verdict, could lead any rational trier of fact to conclude beyond a reasonable doubt that the answer to special issue number one is "yes". See *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979). In making such determination, "we examine whether the jury could rationally find [appellant's] state of mind when [committing the offense] amounted to a 'conscious decision involving a thought process which embraces more than mere will to engage in the conduct.'" *Webb v. State*, 760 S.W.2d 263, 267 (Tex.Crim.App. 1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989). The jury can accept or reject any or all of a witness' testimony. *Hemphill v. State*, 505 S.W.2d

3. The dispatcher's report described a white 1975 Ford LTD with an Alabama license tag. Appellant's vehicle was actually a light blue 1975 Ford LTD with a white top and although it had an Alabama tag, the number differed from that given by the dispatcher. When appellant was stopped, one of the officers radioed the dispatcher and informed him that they were stopping a vehicle that "somewhat" matched the vehicle described in the report.

4. Appellant had checked into the motel with a stolen credit card, using the name of the person appearing on the card. Upon discovering that

the card was stolen, the manager called appellant at his room and asked him to return to the front desk so that his card could be re-run for another imprint. Appellant became hostile, but agreed to bring the card back to the desk for another imprint. However, appellant then left the motel.

5. The first submitted issue read as follows:

Was the conduct of [appellant], that caused the death of the deceased, Mark A. Frederick, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

560, 562 (Tex.Crim.App.1974). This court does not resolve issues of factual sufficiency as a super or thirteenth juror, re-weighing the evidence; rather, we act only "as a final due-process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

We conclude a rational trier of fact could have believed the State's evidence and disbelieved appellant's version of events. As we stated in *Carter v. State*, 717 S.W.2d 60, 68 (Tex.Crim.App.1986), *cert. denied*, 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 407 (1987), where the defendant asserted that the offense had been an accident, the jury is the "judge of the credibility of the witnesses and the weight to be given their testimony."

Evidence presented at trial, largely through appellant's own testimony, revealed that appellant had numerous reasons to fear being pulled over by DPS troopers, including violation of the terms of his probation for a federal offense. In addition, appellant was driving a rental car that was to be returned over two months earlier and he had replaced the original license plates with plates he claims he "found". Appellant had been traveling cross-country for several months, living off of stolen and forged checks and stolen credit cards. Appellant had just attempted to check into a motel with a stolen credit card, had been questioned about the card, and had fled the motel. Finally, the trunk of appellant's vehicle contained firearms and ammunition, including a sawed-off shotgun.[6] Trooper Reichert testified that appellant sat in his car, staring straight ahead as Frederick approached. Reichert further testified he heard only a single muffled gunshot, immediately after Frederick turned to face appellant and just prior to the deceased falling to the ground. Reichert was positive that the deceased had not fired his gun at any time. The State's firearms expert testified that an unusually hard pull, or a deliberate act was required to fire the type of handgun used by appellant in the offense. Appellant fled the scene and upon capture two and a half days later, appeared ready to fire at the approaching helicopter operator. We conclude the evidence, viewed in the light most favorable to the verdict, supports the jury's affirmative answer to the first submitted issue.

### B. State constitutional grounds

■ Appellant argues that even if the evidence is constitutionally sufficient under *Jackson*, this Court should adopt, in place of the *Jackson* standard for constitutional sufficiency, a factual sufficiency "against the overwhelming weight of the evidence" test in capital cases under the Texas Constitution. Under this test, appellant asserts, the jury's affirmative answer to the first submitted issue amounts to "cruel and unusual" punishment in light of the "overwhelming evidence" that Reichert's account was false and appellant's account was true. We need not today decide whether or not this Court should adopt a different standard of sufficiency review under the Texas Constitution because even under a factual sufficiency review, the overwhelming weight of the evidence would *not* dictate a finding that appellant's account was more believable than the State's, so as to find that appellant did *not* act deliberately. At best, appellant presented some evidence in contradiction of the State's evidence, but it did not amount to *overwhelming* evidence that the State's case was incredible and not supportive of the verdict.[7] Points of error one and two are overruled.

---

**6.** The following firearms and ammunition were found in the trunk of appellant's car: a .30 caliber M–1 carbine, loaded with a fifteen-round clip, a sawed-off short barrel twelve gauge shotgun, loaded with double aught buckshot three inch magnums, a .300 Winchester Magnum Colt Sauer, and extra shotgun and .38 caliber shells.

Appellant testified that he had purchased the shotgun and ammunition, at the insistence of a friend who was a police officer, after having been robbed. Appellant stated that his friend convinced him to saw off the barrel of the shotgun in order to carry it in his car with greater maneu-

verability. Appellant admitted stealing some of the other guns.

**7.** According to appellant's testimony, he fired only after being fired upon first by the troopers. Appellant testified that after he was stopped, he reached for his wallet from the glove compartment so that he could retrieve his driver's license, when two shots suddenly came through his rear window. He reached for his gun when he realized what was happening and blindly fired one shot before fleeing the scene. On cross-examination appellant admitted having told sev-

In points of error three and four appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to submitted issue two,[8] under the eighth and fourteenth amendments to the United States Constitution, and under article one, sections thirteen and nineteen, of the Texas Constitution.

### A. Federal constitutional grounds

■ In reviewing the constitutional sufficiency of the evidence to support the jury's affirmative finding on the second special issue we ask whether the evidence, viewed in a light most favorable to the verdict, could lead a rational fact finder to conclude beyond a reasonable doubt that there is a probability that the answer to the second submitted issue is "yes". *Cantu v. State*, 842 S.W.2d 667, 674 (Tex.Crim.App.1992), *cert. denied* — U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). Factors to be considered by the jury in its deliberations on the second issue include:

1. The circumstances of the capital offense;

2. The calculated nature of the defendant's conduct;

3. The deliberateness exhibited in the crime's execution;

4. The existence and severity of the defendant's previous offenses;

5. Whether the defendant was acting under duress or the domination of another at the time of the crime;

6. The defendant's age and personal circumstances;

7. Psychiatric evidence; and

8. Character evidence.

*Id.* at 675.

■ The subject offense did not involve facts which, alone, would justify an affirmative answer to the second issue. The instant offense was not committed pursuant to the type of calculated prior planning often present in cases where the offense alone is sufficient to support an affirmative finding on the second issue. *Moreno v. State*, 858 S.W.2d 453, 459 (Tex.Crim.App.1993) (defendant "carefully plotted for months to abduct and kill someone for money"). Nor did the subject offense involve facts that were so shockingly brutal or heinous in nature as to alone support an affirmative finding on the second issue. *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (victim repeatedly stabbed, robbed, sexually assaulted and left lying in sun for five days).

The State points to the following evidence, in addition to the facts of the subject offense, which it claims supports the jury's finding on the second issue:[9]

1. Testimony of appellant's former wife that appellant beat her on numerous occa-

---

eral different and conflicting versions of the offense over the years and did not know how many different versions he had told.

Reichert testified that he was positive Frederick did not fire his gun. The deceased was found holding his gun following the shooting, but no tests were conducted on the deceased's hand to determine whether he had fired it. The gun did contain three empty shells, but Reichert testified that he examined Frederick's gun at the scene and found it to be malfunctioning. Tests conducted on the deceased's gun also found it to be malfunctioning. There was testimony that one of the bullets that struck appellant's vehicle could have come from the type of gun carried by the deceased. There was also testimony that because that bullet hole appeared to be older than the other bullet holes, it may have been the result of an earlier shooting incident, which might have involved a gun similar to the one carried by the deceased. Reichert also testified that a week prior to the offense he and Frederick had fired their revolvers at a firing range, which, he sug-

gested, might explain the three empty shells in Frederick's gun.

The defense called an expert witness who testified, on the basis of hypotheticals, that appellant's version of events was more consistent with the physical evidence than the State's version. His testimony was contradicted by witnesses for the State.

While appellant presented some evidence which contradicted the State's evidence, the overwhelming weight of the evidence does not lead to the conclusion that appellant's version of events is more credible than the State's.

8. The second submitted issue read as follows:

Is there a probability that [appellant] would commit criminal acts of violence that would constitute a continuing threat to society?

9. This list does not include *all* of the evidence the State claims supports the jury's affirmative finding, but based upon our review of the record, the list includes the evidence most supportive of the jury's finding.

sions, one time attempting to choke her, causing her to vomit blood following the incident;

2. Testimony of appellant's wife that appellant's acts of criminal violence had escalated during their marriage, that she believed he would commit future acts of violence and that he would cause her harm if released from prison;

3. Appellant was disfellowshipped from his church, the Jehovah's Witnesses, due to lying, writing bad checks and his "bad business deals". Given a second chance, appellant was again disfellowshipped. Appellant threatened to kill or harm a church elder who sat in on appellant's disfellowship proceedings;

4. Appellant's prior felony conviction for extortion (appellant made several bomb threats by telephone to radio and television stations, claiming to have kidnapped two children and demanding one hundred thousand dollars);

5. Testimony of Gene Owens, the F.B.I. investigator who had investigated appellant in connection with the extortion offense, that appellant would constitute a continuing violent threat to society;

6. Stolen guns, money and numerous stolen and forged checks, most often stolen from persons who had placed appellant in a position of trust;

7. Several faked reports of stolen traveler's checks in exchange for cash;

8. Numerous guns and ammunition which appellant had traveled with in the trunk of his vehicle, including a sawed-off shotgun;

9. Appellant's written plans to rob a bank, involving the use of firearms;

10. Testimony of appellant's own witness, a prison warden who supervised appellant on death row, that appellant was a con man who had learned to manipulate the system and appeal to the media for his own benefit;

11. Testimony of S.E. Estes, an assistant prison warden, that appellant was manipulative, dangerous and violent; and

12. Appellant's actions in aiming his pistol at the DPS helicopter prior to his capture.

Consideration of other cases addressing the sufficiency of the evidence to support an affirmative finding on the second submitted issue are helpful to our determination here. The State points to *Kunkle v. State,* 771 S.W.2d 435 (Tex.Crim.App.1986), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989), as comparable to the instant case. There, the defendant argued that since the only act of violence shown to have been committed by him was the capital offense for which he was tried, the evidence was insufficient to support the jury's affirmative finding on future dangerousness. *Id.* at 445. In addition to the crime itself,[10] the State presented evidence that the defendant had behavioral and attitude problems in school, that he lacked respect for rules and the rights of others, psychological testimony that he would be likely to continue to commit future acts of violence and evidence of the defendant's possession of a loaded .22 caliber gun, which had been reported stolen. *Id.* at 449. We held there was sufficient evidence upon which a rational jury trier of fact could have found beyond a reasonable doubt that the defendant would be a continuing threat to society.

In *Delk v. State,* 855 S.W.2d 700, 708–09 (Tex.Crim.App.1993), the defendant's prior offenses included a simple assault and an aggravated assault. There was also testimony that the defendant had threatened a number of people with physical violence or death and had on one occasion threatened his wife with a shotgun. We observed that "[a]lthough no such threat of violence ever came to fruition until commission of the instant offense, the threats themselves tend to show a predisposition towards violent conduct under conditions amounting to less than substantial provocation." *Id.* at 708. We recog-

---

10. The capital murder at issue in *Kunkle* was committed in the course of a robbery. The defendant and his friends drove around looking for someone to rob. Spotting the deceased walking along the road, they persuaded him to get into the car. The defendant shot the deceased in the head, took his wallet and pushed the body out of the car.

nized that the evidence of future dangerousness was "minimal", but held that viewing it in the light most favorable to the verdict we could not say a rational jury could not have found the evidence sufficient to support an affirmative finding on the second submitted issue. *Id.*

In *Cockrum v. State*, 758 S.W.2d 577, 592 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989), the defendant pointed to evidence that he was a good brother and son, that he had been a good prisoner, and that he had not committed prior acts of violence in support of his claim that the evidence was insufficient to justify the jury's affirmative finding on the second issue. We held that the defendant's dominant role in the commission of the robbery/murder, his prior planning of the offense and procurement of a weapon, testimony from two law enforcement officers that he had "a bad reputation within the community", and his convictions for burglary of a building, attempted burglary of a habitation and possession of marijuana, supported the jury's affirmative finding. *Id.* at 593–94. Although the defendant argued that his prior extraneous offenses did not involve violence, we noted that burglary "provides an inherent potential to escalate into violence" and burglary of a habitation "provides a particularly high potential for violence." *Id.* at 593.

By contrast, in *Keeton v. State*, 724 S.W.2d 58, 64 (Tex.Crim.App.1987), the defendant had been convicted of one felony theft, with probation revoked, as a result of a burglary of a coin-operated machine. No psychiatric testimony, character testimony or evidence of other acts of violence was offered. We held the evidence was insufficient to support the jury's affirmative answer on the second issue. *Id.*

In the instant case, although none of appellant's prior convictions involved physical vio-

lence, his extortion conviction involved threats of physical violence. *See Delk, supra.* Further, the testimony of appellant's wife indicates that appellant was capable of more than threats of violence. The string of crimes committed by appellant in the two and a half months preceding the instant offense, and appellant's collection of weapons along the way, indicates that appellant's violent tendencies were escalating. *See Kunkle; Cockrum.* The plans of the bank robbery and appellant's readiness to fire on the DPS helicopter upon his capture further demonstrate a propensity for violence. Viewing the evidence in a light most favorable to the jury's finding, we hold a rational trier of fact could have found beyond a reasonable doubt that appellant would commit future criminal acts of violence that would constitute a continuing threat to society.

### B. State constitutional grounds

■ As discussed in connection with his first two points of error, appellant urges this Court to adopt a factual sufficiency "against the overwhelming weight of the evidence" test. Appellant argues that under such test, the overwhelming weight of the evidence demonstrates the jury's verdict on the second submitted issue was not a rational one. Again, we need not decide today whether or not this Court should adopt a different standard of sufficiency review under the Texas Constitution because even under the type of factual sufficiency review urged by appellant, the overwhelming weight of the evidence would *not* lead to the conclusion that the jury's affirmative finding on the second issue was not rational. While some of the evidence pointed to by appellant may tend to weaken the State's evidence on the second issue, it does not amount to such "overwhelming evidence" as to lead to the conclusion that the jury's affirmative finding was not rational.[11] Points of error three and four are overruled.

---

**11.** The "overwhelming evidence" appellant points to includes the following:

1. The uncalculated and "equivocal" nature of the instant offense;
2. Evidence that thirty-three of appellant's thirty-six years, including his years in prison, were crime-free;

3. The extraneous offenses committed by appellant were non-violent, property-related crimes;
4. Appellant's assertion that because appellant's wife had not seen appellant since their divorce in 1974 and because Gene Owens had not seen appellant in more than thirteen years, their testimony should be given little or no weight;

In his fifth, sixth, seventh and eighth points of error, appellant claims the jury's assessment of the death penalty, and article 37.071 as applied to appellant, are violative of the eighth and fourteenth amendments to the United States Constitution, and article one, sections thirteen and nineteen of the Texas Constitution, because the evidence mitigating against the death penalty overwhelmingly outweighs the evidence justifying its imposition.[12] Appellant urges this Court to conduct an independent review of the aggravating and mitigating evidence to determine appellant's deathworthiness.

### A. Federal constitutional grounds

■ The United States Supreme Court has held that such a review is not required under the eighth and fourteenth amendments to the United States Constitution. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Moreover, we have previously declined to re-weigh evidence and make an individualized determination of a defendant's deathworthiness in light of the mitigating evidence. *Burns v. State,* 761 S.W.2d 353, 356 n. 4 (Tex.Crim.App.1988) (we have "abandoned any pretense of ... balancing mitigating and aggravating evidence so as to determine, independently of the jury's verdict, the 'appropriateness' or 'justness' of imposition of the death sentence in a given case").

### B. State constitutional grounds

■ Appellant argues that we should provide greater protection under our own constitution and require a proportionality review under article one, sections thirteen and nineteen of the Texas Constitution. Appellant further asserts that the overwhelming weight of the mitigating evidence compels a finding

5. Estes' testimony on cross-examination that his conclusions about appellant's future dangerousness were based largely upon the fact that appellant had killed a police officer; and

6. The State's psychiatrist testified that he could not state with certainty that appellant would commit future acts of violence.

12. We note that appellant also asserts various *Penry*-related claims, in points of error twenty-one through twenty-eight.

that appellant is not "deathworthy" and therefore his death sentence should be reformed to a life sentence. We will not today decide whether or not this Court should conduct a proportionality review under the Texas Constitution because even under such a review, the evidence pointed to by appellant as mitigating does not overwhelmingly outweigh the State's evidence in support of the jury's verdict on the submitted issues.[13] Points of error five through eight are overruled.

■ In points of error nine, ten and eleven, appellant claims the trial court erred in overruling his objections to the definitions in the jury instructions at guilt/innocence of "intentionally" and "knowingly", thereby denying appellant his right to a fair and impartial trial and due process of law, in violation of the sixth and fourteenth amendments to the United States Constitution and article one, section nineteen of the Texas Constitution.

The definitional portion of the court's charge provided, in relevant part, that:

A person acts "intentionally," or with intent, with respect *to the nature of his conduct* or to a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result.

*A person acts "knowingly," or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.* A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

13. Appellant points to evidence of his "initial 21 years of crime-free, violence-free behavior", twelve years of good behavior in prison, the "meaningful, productive activities in which [he] has been engaged" on death row, his youth when the crime was committed (twenty-four years), and his unstable mental and emotional state before and at the time the crime was committed due to his divorce, financial problems and disfellowship from the Jehovah's Witnesses, in support of his claim that the death penalty should not be imposed against him.

(emphasis added). Appellant claims the emphasized portions of the definitions permitted the jury to find criminal liability from the knowledge of conduct or circumstances surrounding the conduct (ie; intent to pull trigger) rather than from the consequences or results of the conduct (intent to cause death of deceased).

In our opinion handed down this day, *Cook v. Texas*, 884 S.W.2d 485 (Tex.Crim.App. 1994), we addressed virtually this same issue in the context of an intentional murder case. There, the defendant was charged with murder and convicted of the lesser included offense of voluntary manslaughter. The jury charge included the full statutory definitions of "intentionally" and "knowingly", as here. The defendant objected to the charge, reasoning that since murder is a "result of conduct" offense,[14] the definitions of intentionally and knowingly should have been limited to the result language only. *Id.*, at 486. We agreed, holding that because intentional murder under Penal Code § 19.02(a)(1) is a result of conduct offense, the trial court erred in refusing to limit the definitions of culpable mental states to the result of conduct.[15] *Id.*, at 491–92.

Section 19.03(a) of the Penal Code describes particular factual contexts that the Legislature has determined, in combination with an intentional murder, gives rise to capital murder. In proving capital murder, the State must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (ie., kidnapping, robbery, aggravated sexual assault, escape from a penal institution) or had knowledge of certain circumstances (ie., that the victim was a peace officer). Therefore, while we have said that capital murder is a result of conduct offense, *Turner v. State*, 805 S.W.2d 423, 430 (Tex.Crim.App.), *cert. denied*, 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991), it is

more accurate to view it as a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder. We accordingly recognized in *Cook*, in dicta, that in a capital murder case involving more than one conduct element it would not be error for the definitions to include more than the result of conduct element:

... since the State must prove every element of the capital murder and of the underlying offense, [citations omitted] in *capital murder cases*, there is no error in failing to limit the court's charge to specific "result of conduct" language when the additional language concerning the culpable mental state is itself limited to proving the "conduct elements" for the underlying offense.

*Cook*, 884 S.W.2d at 489 n. 3 (emphasis in original). However, under the Court's reasoning in *Cook*, it would be error in a capital murder case involving only two of the three conduct elements, if the definitions included all three of the conduct elements.

The indictment in the instant case charged that:

[Appellant] did then and there intentionally and knowingly cause the death of [the deceased] by shooting him with a gun; and that the said deceased was a peace officer acting in the lawful discharge of an official duty and that the [appellant] then and there knew the said deceased was a peace officer[.]

This offense can be viewed as including two of the three conduct elements. The State was required to prove that appellant intentionally or knowingly caused the death of the deceased (result of conduct), and that appellant knew the deceased was a peace officer (circumstances surrounding the conduct).

14. As stated in *Cook*, "Penal Code, Sec. 6.03 delineates three "conduct elements" which may be involved in an offense: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct." *Cook*, 884 S.W.2d at 487 (quoting *McQueen v. State*, 781 S.W.2d 600, 603 (Tex.Crim.App.1989).

15. Prior to *Cook*, we held in *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App.1990), that the inclusion of all of the conduct elements in the mental states definitions in a capital murder case was inconsequential so long as the definitions were correctly applied in the application paragraph. However, *Kinnamon* was expressly overruled in *Cook*. *Cook*, 884 S.W.2d at 491–92.

As mentioned previously, the definitional portion of the jury charge included the full statutory definitions of intentionally and knowingly, including result, nature and circumstances of conduct language. Because this offense does not contain a nature of conduct element, the trial court erred by failing to limit the definitions of culpable mental states to result and circumstances of conduct.[16] *See Cook*, 884 S.W.2d at 491–92. Our next inquiry is whether the error resulted in some actual, rather than theoretical, harm to appellant. *See Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1984); *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986).

In *Almanza*, we stated that in the case of properly preserved charge error, "reversal is required if the error is 'calculated to injure the rights of the defendant,' which means no more than that there must be *some* harm to the accused from the error[.]" *Almanza*, 686 S.W.2d at 171 (emphasis in original). We have further stated that "[u]nless *all* harm was abated, appellant suffered some harm." *Miller v. State*, 815 S.W.2d 582, 586 n. 5 (Tex.Crim.App.1991) (opinion on reh'g) (emphasis in original). In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we "may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Cook*, 884 S.W.2d at 492 fn. 6.

The application portion of the charge provided, in relevant part, as follows:

> Now, bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 4th day of April, 1976, in Austin County, Texas, the defendant, Billy George Hughes, Jr., did intentionally and knowingly cause the death of Mark A. Frederick, a peace officer acting in the lawful discharge of an official duty, by shooting him with a gun, and the said Billy George Hughes, Jr., then and there knew that the said Mark A. Frederick was a peace officer, then you will find the defendant, Billy George Hughes, Jr., guilty of capital murder as charged in the indictment and so say by your verdict. . . .

Although the definitions of "intentionally" and "knowingly" indiscriminately set forth the three alternative conduct elements, when those terms are viewed in their factual context, it becomes apparent which conduct element applies to which element of the offense. For instance, the application paragraph states that appellant "did intentionally and knowingly cause the death of [the victim.]" The terms "intentionally and knowingly" directly modify the phrase "cause the death". Referring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and "cause the result" language are the applicable portions of the full code definitions. Likewise, the application paragraph states that appellant "knew that the said [victim] was a peace officer". Referring back to the definitions of "knowingly", it is clear that the applicable portions are the "circumstances surrounding" the conduct language. We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of culpable mental states to result and circum-

16. In addition, in *Cook,* we stated that in a capital case where the underlying offense involves a conduct element other than result of conduct, "the additional language concerning the culpable mental state [must be] limited to proving the "conduct element" of the underlying offense. *Cook,* 884 S.W.2d at 489 n. 3. Following is an example of a charge which would have appropriately limited the definitions of culpable mental state for the offense charged in the instant case:
The following definition applies to mental state in causing death:
A person acts "intentionally" or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
A person acts "knowingly" or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
The following definition applies to mental state in knowing the victim was a peace officer:
A person acts "knowingly" or with knowledge, with respect to circumstances surrounding his conduct when he is aware that the circumstances exist.

stances of conduct. Points of error nine, ten and eleven are overruled.

In points of error twelve through fifteen, appellant claims the inclusion in the trial court's charge of instructions on causation violated his right to a fair and impartial trial and due process of law under the sixth and fourteenth amendments to the United States Constitution and article one, section nineteen of the Texas Constitution. Appellant argues that the charge permitted the jury to find that appellant was guilty of capital murder if it concluded the deceased would not have died "but for" some other unspecified conduct not alleged in the indictment, even if appellant did not intend to kill the deceased. Appellant further argues that no factual issue of causation was raised by the evidence and therefore it was error to include a causation instruction in the charge.

Paragraph four of the jury charge at guilt/innocence provided:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:

(1) a different offense was committed, or

(2) a different person or property was injured, harmed, or otherwise affected.

■ A jury charge on causation is called for only when the issue of concurrent causation is presented. *Robbins v. State,* 717 S.W.2d 348, 351 (Tex.Crim.App.1986). "Concurrent causation" means that more than appellant's conduct, that is " 'another cause' in addition to [appellant's] conduct", was in issue. *Id.* at 351 n. 2. Here, there was no real issue of concurrent causation and accordingly the charge erroneously included the instruction.

■ When an abstract charge is erroneously given on a theory of law, without specific application to the facts of the case,

the overruling of an objection to the abstract charge is not error. *See Lewis v. State,* 815 S.W.2d 560, 562 (Tex.Crim.App.1991) (erroneous abstract charge on transferred intent not error when theory was not applied to facts in application paragraph), *cert. denied* 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992); *cf. Jones v. State,* 815 S.W.2d 667, 670 (Tex.Crim.App.1991) (charge that contains abstract paragraph on theory of law on which accused is prosecuted, but does not apply law to facts, deprives defendant of fair trial). Here, the abstract paragraph on causation did not apply that theory to the facts of the instant case. Neither did the application paragraph incorporate the concept of concurrent causation. Accordingly, the jury was not authorized to convict on the theory of causation. *See Lewis.* Points of error twelve, thirteen, fourteen and fifteen are overruled.

■ In points of error sixteen, seventeen, eighteen and nineteen, appellant claims the trial court erred in overruling his objections to "instructing the jury ... that at the time of his death Mark A. Frederick was 'acting in the lawful discharge of an official duty' " and in refusing to submit his proposed instructions. Appellant argues that because the description of the car and the license tag number given in the dispatcher's report did not match appellant's car and tag number, Frederick was not acting in the lawful discharge of his official duty in stopping appellant. Appellant's requested charge instructed the jury that an officer is not engaged in the lawful discharge of an official duty if he is engaged in an unconstitutional stop or detention.

In *Montoya v. State,* 744 S.W.2d 15, 29 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988), a capital murder case, the defendant argued that because the deceased officer was not acting in the lawful discharge of his official duty at the time of the offense, the defendant was entitled to a jury instruction on the lessor included offense of murder. We held:

Whether [the officer] was making a lawful arrest is not relevant to determining if [the officer] was acting in the lawful discharge

of his duties. A police officer is still acting within the lawful discharge of his official duties when he makes an unlawful arrest, so long as he is acting within his capacity as a peace officer.

*Id.* Relying on the reasoning in *Montoya*, we rejected a claim similar to appellant's in *Guerra v. State*, 771 S.W.2d 453 (Tex.Crim. App.1988), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989). The defendant in *Guerra* argued the evidence failed to establish that the deceased officer was making a valid warrantless arrest and therefore he was not acting in the lawful discharge of an official duty for purposes of Penal Code section 19.03(a)(1). *Id.* at 460. We rejected that contention, holding that the "determination of whether the officer was engaged in making a valid arrest at the time of his death is not necessary to the resolution of whether the officer was acting within the lawful discharge of his official duties." *Id.* at 461. In response to the defendant's further contentions that the record did not show the nature of the officer's official duty, we noted that the officer was assigned to a K–9 patrol unit, was on duty, in uniform, driving an unmarked car and accompanied by his K–9 partner at the time of the offense. *Id.* Immediately before encountering the defendant, the officer was informed by a citizen that the vehicle driven by the defendant had almost run someone over. We held the evidence clearly showed the officer was engaged in his official duty. *Id.*

We likewise hold appellant's claim is without merit. *Id.; Montoya.* Whether or not Frederick's stop of appellant was constitutionally reasonable "is not relevant to determining if [Frederick] was acting in the lawful discharge of his duties." *Montoya, supra.* The record reflects that Frederick was "acting within his capacity as a peace officer" at the time of the offense. He was on duty, in uniform and patrolling Interstate 10 with his partner when they heard and responded to the dispatcher's report. Points of error sixteen through nineteen are overruled.

In point of error twenty appellant claims "[t]he jury's verdict affirmatively finding that Appellant had used or exhibited a deadly weapon in the commission of the offense violated Appellant's rights under Art. 1, § 10 (the *ex post facto* clause) of the Constitution of the United States."

The jury was instructed to determine whether appellant had used or exhibited a deadly weapon in the commission of the offense, pursuant to articles 42.12 § 3g and 42.18 § 8(b) of the Texas Code of Criminal Procedure. Appellant objected that because these statutes, which prescribe a mandatory minimum prison term in the event of an affirmative finding, were not enacted until after the commission of the instant offense, they amount to *ex post facto* laws as applied to appellant. The court overruled appellant's objections and the jury returned an affirmative finding which was included in the judgment.

The *ex post facto* clause prohibits the enactment of any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall) 277, 325–326, 18 L.Ed. 356 (1867). Two elements must be present in order for a criminal law to be *ex post facto:* (1) it must apply to events occurring before its enactment and (2) it must disadvantage the offender affected by it. *Id.* at 29, 101 S.Ct. at 964–65.

We hold the statutes at issue were not *ex post facto* violations as applied to appellant. In light of the assessment of the death penalty against appellant, the affirmative finding did not harm or disadvantage appellant by resulting in an increased or additional punishment. *See id.* (no ex post facto violation occurs if the change effected does "not increase the punishment"). Rather, the affirmative finding was irrelevant to appellant's sentence of death. Point of error twenty is overruled.

In points of error twenty-one through twenty-eight, appellant complains of various *Penry*[17]-related errors. Appellant

17. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

claims that article 37.071 is unconstitutional as applied to him because it did not permit the jury to give effect to certain mitigating evidence, that the jury instructions "misplaced" the burden of proof by requiring appellant to prove the existence of mitigating circumstances, that the trial court refused to instruct the jury that they could consider and give effect to appellant's mitigating evidence and that the trial court refused to submit appellant's requested verdict form. Appellant claims these errors violate his rights under the eighth and fourteenth amendments to the United States Constitution and article one, sections thirteen and nineteen under the Texas Constitution.[18] Appellant cites *Penry* and *Gribble v. State*, 808 S.W.2d 65 (Tex. Crim.App.1990), *cert. denied*, 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

Appellant does not identify specifically the mitigation evidence at issue in these points of error, except to refer generally to his "mental illness and emotional disturbance before and during the shooting" and "mental and emotional problems from 1973 onward". Based upon the mitigation evidence discussed by appellant in connection with points of error five through eight, it appears that appellant is referring to his "initial 21 years of crime-free, violence-free behavior", twelve years of good behavior in prison, the "meaningful, productive activities in which [he] has been engaged" on death row, his youth when the crime was committed (twenty-four years), and his unstable mental and emotional state before and at the time the crime was committed. We have previously held that virtually every type of evidence pointed to by appellant can be considered within the scope of the special issues and does not call for a *Penry*-type instruction. *See Cantu*, 842 S.W.2d at 693 (evidence of accused's youth and voluntary intoxication at time of offense did not require *Penry* instruction); *Kemp v. State*, 846 S.W.2d 289, 309–10 (Tex.Crim.App.1992)

(positive character traits do not call for *Penry* instruction), *cert. denied*, —— U.S. ——, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993); *Ex parte Jacobs*, 843 S.W.2d 517, 520 (Tex.Crim. App.1992) (efforts of defendant to improve himself and charitable activities while in prison do not call for *Penry* instruction), *cert. denied*, —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Mines v. State*, 852 S.W.2d 941, 951 (Tex.Crim.App.1992) (evidence of mental illness can be given full effect within the first and second submitted issues);[19] *Nelson v. State*, 848 S.W.2d 126, 136 (Tex.Crim.App.1993) (evidence that defendant was a nice person, was not considered violent, was young at the time of the offense, and had a good prison record was not *Penry*-type evidence), *cert. denied*, —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993); *Johnson v. State*, 853 S.W.2d 527, 537 (Tex.Crim.App.1992) (evidence of non-violent behavior can be considered within the scope of the second submitted issue). Appellant's claimed emotional instability, as a result of his divorce, financial troubles and his "disfellowship" from the Jehovah's Witnesses, is not comparable to the permanent mental impairment suffered by Penry. *See Penry*. Neither is it comparable to the "true psychosis" suffered by Gribble. *See Gribble*, 808 S.W.2d at 75–76 (defendant who was sexually abused as a child developed bizarre sexual-related psychosis which lead to episodes of violent behavior). Because we hold that the evidence of appellant's mental and emotional instability could be considered within the scope of the submitted issues, we reject appellant's claim that article 37.071 is unconstitutional as applied to him. Having held the submitted issues provided a vehicle for the jury to give effect to the mitigating evidence, we need not address appellant's claims with respect to the mitigating evidence charge given[20] and to the requested verdict form.

---

**18.** The only argument appellant proffered under the Texas Constitution is the assertion that the "Texas Bill of Rights does not permit the imposition of the death penalty, based upon a trial, evidence, and jury instructions as flawed as these were." Because appellant cites no argument or authority in support of his Texas Constitutional claim, we will not address it.

**19.** I note that I, together with Judge Clinton, joined Judge Baird's dissent to the majority's opinion in *Mines*.

**20.** The charge included the following instruction:

You are instructed that you should answer "No" to any of the foregoing Special Issues if at least ten (10) or more jurors find and be-

*Cf. Fuller v. State,* 829 S.W.2d 191, 209 (Tex. Crim.App.1992) (nullification charge which instructed jury to answer one of the submitted issues "no" if they found that mitigating evidence warranted a life sentence rather than a death sentence satisfied *Penry*), *cert. denied,* — U.S. —, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). Points of error twenty-one through twenty-eight are overruled.

In points of error twenty-nine through thirty-two, appellant claims the trial court erred by requiring the concurrence of ten or more jurors in order to answer any special issue in the negative pursuant to article 37.071(d)(2), in violation of the eighth and fourteenth amendments to the United States Constitution and article one, sections thirteen and nineteen of the Texas Constitution. Appellant argues that such a requirement is unconstitutional because it prevents jurors from individually considering and giving effect to evidence mitigating against the imposition of the death penalty, citing *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

We have previously addressed and rejected similar contentions. *See, e.g., Rousseau v. State,* 855 S.W.2d 666, 687 (Tex.Crim.App. 1993) (rejecting defendant's claims that article 37.071 misleads jury by creating impression that jury must be unanimous in answering "no" to special issues in order to give effect to mitigating evidence); *Draughon v. State,* 831 S.W.2d 331, 337–38 (Tex.Crim.App. 1992) (rejecting constitutional challenges to article 37.071(g) and (d)), *cert. denied,* — U.S. —, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993). Further, the United States Supreme Court has upheld article 37.071 as constitu-

tional and not amounting to cruel and unusual punishment. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Moreover, *McKoy* and *Mills* are not controlling.

Appellant asserts that the capital sentencing schemes at issue in *Mills* and *McKoy* were held unconstitutional because those schemes required a unanimous finding on the mitigating evidence. Appellant argues that the Texas scheme is unconstitutional under *McKoy* and *Mills* "because ... there is no principled constitutional distinction to be drawn between a requirement of juror unanimity ... and a requirement of 10 or more jurors". Appellant misconstrues *McKoy* and *Mills*. Under the capital sentencing scheme at issue in *Mills,* jurors were given the impression that they were precluded from considering any mitigating evidence unless they unanimously agreed on the existence of a particular circumstance. *Mills,* 486 U.S. at 384, 108 S.Ct. at 1870. The critical factor there was not the unanimity requirement in general, but the impression that all of the jurors must agree on the existence of the *same* mitigating circumstances before the mitigating evidence could be given effect.[21] The scheme at issue in *McKoy* also prevented the jury from considering any mitigating factor it did not unanimously find. The Texas scheme does not require jurors to agree on the existence of the same mitigating evidence. Further, the Texas scheme allows a single juror to give effect to mitigating evidence by voting "no" on any special issue. The fact that they do not know the effect of their answers does not subject appellant to cruel and unusual punishment under the United States Constitution.[22] *Rousseau,* 855

---

lieve, based upon the evidence presented to you in this case, that the Defendant's character or record or any of the circumstances of the offense mitigate against the imposition of the death penalty in this case.

**21.** The Texas legislature amended article 37.071, subsequent to *Mills,* to expressly provide that jurors need not agree on what particular evidence supports a negative or affirmative answer to the special issues. TEX.CODE CRIM.PROC.ANN. art. 37.071(2)(d)(3), (2)(f)(3) (amendments effective September 1, 1991). The interpretive commentary stated that these revisions "foreclose the

potential for challenges" based upon *Mills*. We note, however, that the article prior to the revisions did not violate *Mills*. *See Rousseau,* 855 S.W.2d at 687; *Draughon v. State,* 831 S.W.2d at 338.

**22.** The only argument appellant makes under the Texas Constitution is his assertion that "[t]he Texas Bill of Rights does not permit the imposition of the death penalty, based upon a trial, evidence, and jury instructions as flawed as these were." Because appellant cites no authority or argument in support of his Texas Constitutional claim, we will not address it.

S.W.2d at 687. Points of error twenty-nine through thirty-two are overruled.

■ In points of error thirty-three through thirty-eight, appellant claims the trial court's refusal to inform the jury of the effects of their answers to the submitted issues violated the eighth and fourteenth amendments to the United States Constitution and article one, sections thirteen and nineteen of the Texas Constitution. Appellant also complains of the trial court's refusal to instruct the jury that if appellant were given a life sentence, he would be required to serve at least twenty years, without the possibility of parole or time off for good behavior.

Appellant's contentions are without merit. This Court has repeatedly held that declining to inform jurors of the effect of their answers to the submitted issues does not render article 37.071 unconstitutional. *See, e.g., Rousseau,* 855 S.W.2d at 687; *Draughon,* 831 S.W.2d at 337–38; *Cantu,* 842 S.W.2d at 692–93; *Davis v. State,* 782 S.W.2d 211, 22–22 (Tex.Crim.App.1989), *cert. denied* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). Appellant's claims relating to parole instructions is also a settled issue. We have consistently found no merit in such contentions. *See, e.g., Jones v. State,* 843 S.W.2d 487, 495 (Tex.Crim.App.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Knox v. State,* 744 S.W.2d 53, 62–64 (Tex. Crim.App.1987), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988); *Andrade v. State,* 700 S.W.2d 585, 587–88 (Tex. Crim.App.1985), *cert. denied,* 457 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986). Points of error thirty-three through thirty-eight are overruled.

■ In point of error thirty-nine appellant claims the trial court's instruction on mitigating circumstances was "an attempted judicial amendment of a legislative act", in violation of article two, section one of the Texas Constitution, the separation of powers doctrine.[23]

We need not reach the merits of appellant's claim. Even if the mitigating evidence charge was given in violation of the separation of powers doctrine, reversal is not called for because any error was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2); *see also Rose v. State,* 752 S.W.2d 529, 553–54 (Tex.Crim.App.1987) (op. on reh'g) (separation of powers violation is subject to 81(b)(2) analysis). We held previously in this opinion that appellant was not entitled to a special charge on mitigating evidence. Therefore, the inclusion of a mitigating evidence instruction which permitted the jury to answer no to any of the special issues could not have contributed to the jury's affirmative findings on the issues. Point of error thirty-nine is overruled.

■ In points of error forty and forty-one, appellant claims the trial court erred by refusing to instruct the jury that the term "probability", as used in the second punishment issue, means "more likely than not". Appellant recognizes the existence of authority to the contrary, but argues that in this case such an instruction was necessary because of testimony elicited during appellant's cross-examination of the State's psychiatrist, Dr. John David Nottingham, that the term "probability" means "any probability". That State contends appellant failed to preserve error on this issue. We agree with the State.

Objecting to the charge at trial, appellant argued that the "word 'probability' is on its face unconstitutionally vague, uncertain and inspecific ... to the extent it is interpreted or construed as meaning something less than more likely than not" and that the court's failure to define the term as more likely than not allowed the jury to speculate as to the meaning of the term and potentially convict "on evidence establishing something less than the fact that the defendant more likely than not would commit criminal acts of vio-

---

**23.** The charge in the instant case was submitted to the jury on June 10, 1988. At this time, article 37.071(b) provided for the submission of three special issues and did not call for a charge on mitigating evidence. The United States Supreme Court granted certiorari in *Penry v. Lynaugh,* 832 F.2d 915 (5th Cir.1987) on June 30, 1988. Article 37.071 was amended effective September 1, 1991 pursuant to the Supreme Court's decision in *Penry. Ex parte Jacobs,* 843 S.W.2d at 518 n. 3.

lence that would constitute a continuing threat to society". Appellant made no objection to the court's refusal to define "probability" based on Nottingham's allegedly erroneous definition of the term, as he now argues on appeal. Appellant's objections were simply that the term was unconstitutionally vague and that without guidance the jury was left to speculate as to the meaning of the term. Because appellant's claim on appeal does not comport with his objections at trial, error, if any, is waived. *Fuller v. State*, 827 S.W.2d 919, 928 (Tex.Crim.App.), *cert. denied*, — U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1992). Points of error forty and forty-one are overruled.

In points of error forty-two and forty-three, appellant claims the trial court violated his fifth amendment rights [24] by permitting the State's psychiatrist, Dr. Nottingham, to testify at the punishment stage of the trial. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Appellant argues that because appellant was not apprised of his rights prior to a 1976 interview with Nottingham, Nottingham's testimony is not admissible. The State argues that Nottingham's testimony was not based upon or derived from the 1976 interview, but was based instead upon a 1988 interview which did not violate *Smith*. The State concedes that the 1976 interview was in violation of *Smith*.

During the punishment stage of trial, appellant's psychologist testified that appellant's prior criminal behavior resulted from a stress-induced psychological condition called "fugue state". In rebuttal, the State called Dr. Nottingham. It was established in a voir dire examination of Nottingham that he had examined appellant in 1976; again in 1988 but in the presence of appellant's attorneys, after refreshing his memory with notes he had taken during the 1976 interview. The following exchange related to the issue of whether the first interview affected Nottingham's findings in the second interview:

Q. [Defense counsel] What would have been the consequences if you had lost or misplaced your notes and typewritten report of the August 27, 1976, examination?

A. [Nottingham] Well, that's hard to say. He was complete in his answers to me when we were all together during this last examination, other than dealing with issues around the time of the alleged offense, which we all agreed not to get into.

So, he, as I say, gave a lot of biographical information which I would have been able to get without the previous report.

The only difference would have been in comparing his answers to see whether they were different.

\*   \*   \*   \*   \*   \*

Q. Let me ask you the significant question here. How many of these inconsistencies or contradictions [25] could you have recalled with [sic] having had the original August 27, 1976, examination report?

And I mean by that, recall of your own independent recollection 12 years later without having averted to your earlier report.

Obviously I will rely on your integrity in giving us an honest answer.

24. Appellant claims in this appeal that his rights were violated, with respect to points of error forty-two and forty-three, under the fourth, fifth, sixth and fourteenth amendments, but at trial he claimed violations under the fifth, eighth and fourteenth amendments. Further, on appeal appellant presents no argument or authority with respect to his fourteenth amendment claim. Therefore, appellant has preserved error only with respect to his fifth amendment claim.

25. Nottingham testified that there were some discrepancies between appellant's responses in the two interviews. Nottingham stated that in the first interview appellant described himself as getting intoxicated to the point of having blackouts, while in the second interview appellant denied ever having drunk to that point and stated that he only had occasional "hazy" episodes, but no blackouts. Further, in the first interview appellant told Nottingham that when he drank, he became "mean", while in the second interview appellant said he "got nicer" when he drank. Appellant explained his trip around the country in the first interview as being prompted by his feelings of frustration, but in the second interview stated that his trip was for the purpose of visiting people interested in horse breeding. Finally, Nottingham stated that in the first interview appellant told him that on the day of the offense he had consumed a lot of beer and that he had "spotty amnesia", while in the second interview appellant told him he remembered everything.

A. That's why I'm thinking very carefully about it.

I would have remembered that I saw him. I would probably have remembered that drinking was involved in the alleged criminal activity, around the time of the alleged offense. Because that's something I see a lot of in my work. It's a common element in these kinds of situations. So that would have probably stuck in my mind.

I don't think I would remember his reason for going around the country at the time. I don't think that would have stuck.

Q. Or any of the other inconsistencies.

A. I don't think so. Those would be the kind of things I would remember.

Appellant objected to allowing Nottingham to testify on the grounds that his testimony would be tainted from the 1976 interview. Appellant's objections were overruled and Nottingham testified. Nottingham testified only about the 1988 interview and made no reference to the 1976 interview. Nottingham testified that in his opinion appellant was not, nor had he been at the time of the offense, suffering from a "fugue state". These conclusions were expressly premised upon statements made by appellant during the 1988 interview.

■ In *Estelle v. Smith*, the United States Supreme Court held that psychiatric testimony on the issue of future dangerousness was inadmissible where it was based upon the psychiatrist's questioning of the accused without prior warning regarding his fifth amendment rights against self-incrimination and without the opportunity to consult with counsel in violation of his sixth amendment rights. However, when the psychiatrist's testimony has a basis independent of the unconstitutional interview, it may be admissible, so long as it was not "influenced by and derived from" the earlier examination. *Ex parte Woods*, 745 S.W.2d 21, 26 (Tex. Crim.App.1988) (psychiatric testimony based upon hypothetical and not influenced by earlier examination was admissible); *see also Vanderbilt v. State*, 629 S.W.2d 709, 720 (Tex.Crim.App.1981) (psychiatrist's testimony admissible where his responses were based upon hypotheticals and "did not pur-

port to be based upon" the evaluations conducted in violation of *Smith*), *cert. denied*, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982).

■ Review of Nottingham's testimony shows that his conclusions were based upon the 1988 interview alone. On voir dire Nottingham testified that in the 1976 interview appellant stated that he suffered from blackouts due to excessive consumption of alcohol and that his memory of the night of the offense was marked by "spotty amnesia". By contrast, Nottingham testified that in the second interview appellant told him that although he had "hazy episodes", he did not experience blackouts and he had a clear recollection of the night of the offense. Before the jury Nottingham testified that if appellant were suffering from "fugue state", he "would not expect [appellant] to have a very good recall of what had transpired during the so-called fugue state." Nottingham further testified as follows:

Q. [Prosecutor] Did you see anything in your examination of the defendant on that occasion[, the 1988 interview,] that would lead you to believe that he may have suffered or been in a so-called fugue state at the time of the commission of the offense for which he was under indictment when you saw him?

A. [Nottingham] No, sir. There were no indications from what he told me of any period of time where he had periods of amnesia, where he did not know what was happening.

*     *     *     *     *     *

Q. [Prosecutor] And did you have an occasion, when you examined the defendant on April 28th of this year, to question him concerning his recall of the events surrounding the offense for which he was charged at that time?

A. [Nottingham] Yes, sir. He acknowledged to me that at times when he uses alcohol that he may use it to a point where memory, his words, Quote, hazy, unquote.

I specifically asked him whether he ever had experienced absolute blackouts, absolute amnesia, and he denied it very clearly that never had occurred.

Q. ... What did he indicate to you on April 28th this year, when you examined him, concerning his ability to recall the events of early 1976?

A. He indicated there were no periods of amnesia.

Q. And that he had total recall.

A. Well, total recall, none of us usually have total recall, usually.

But certainly he told me that there were no gaps in his memory. He had some haziness associated with it, intoxicated state. But that's fairly typical.

Nottingham's opinions about whether appellant suffered from a "fugue state" and other matters related thereto were expressly premised upon his 1988 examination of appellant. There is no indication on the record that his testimony was influenced by or derived from his earlier examination of appellant. Points of error forty-two and forty-three are overruled. See Ex parte Woods; Vanderbilt.

■ In points of error forty-four, forty-five, forty-eight, forty-nine, fifty and fifty-one, appellant argues that the following closing arguments violated his federal and state constitutional rights: (1) the State's appeal for the imposition of the death penalty because it was imposed in appellant's first trial,[26] (2) the State's argument that the death penalty is appropriate because appellant had shown no remorse and (3) the State's request for the death penalty because of the impact of appellant's crime on appellant's family and the victim's family. However, because appellant made no objection to these arguments at trial, no error is preserved. Appellant's claim that these arguments were so manifestly improper that no objections were necessary is without merit. Points of error forty-four, forty-five, forty-eight, forty-nine, fifty and fifty-one are overruled.

■ In points of error forty-six and forty-seven, appellant claims the State's accusations during its closing arguments of a breach of ethics against a defense psychologist for having testified that appellant would not constitute a continuing threat to society violated appellant's rights under the eighth and fourteenth amendments to the United States Constitution and article one, sections thirteen and nineteen of the Texas Constitution. Appellant claims the attack on the defense witness "was equivalent to imputing the supposed misconduct to Appellant, or his counsel, or both". The State contends the argument was a proper summation of the evidence.

During the punishment phase of trial, Dr. Wendall Dickerson, a psychologist, testified for the defense. Dickerson stated that in his opinion he did not consider appellant a continuing threat to society and that it was more likely than not appellant would not commit criminal acts of violence in the future. On

---

**26.** Appellant complains of the following statements made by the prosecutor in closing argument at punishment:

> You know, in 1976 12 Matagorda County citizens had the opportunity to speak in this case. And they spoke. And Judge Hardy sentenced him.
>
> They answered the questions. And they dealt with the issues as the law and evidence led them to.

Appellant did not object to these statements. Appellant now argues that these statements "cannot be squared with the jury's obligation under the Eighth and Fourteenth Amendments to assume responsibility for its own decision as to the appropriate penalty", citing *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell*, the prosecutor argued as follows: ... [the defense] would have you believe that you're going to kill this man and they know— they know that your decision is not the final decision. My God, how unfair can you be?

Your job is reviewable. They know it. Yet the ...

*Id.* at 325, 105 S.Ct. at 2637. The defendant objected to the argument, but the trial court permitted it and agreed with the State that "it [is] proper that the jury realizes that it is reviewable automatically as the death penalty commands." *Id.*

We disagree that the statements made here are comparable to those made in *Caldwell*. In *Caldwell*, the prosecutor expressly told the jury that they would not be responsible for their sentence of death because their's was "not the final decision." Here, the prosecutor did not state or even suggest that the jury was not somehow not responsible for its verdict. Any suggestion that the jury should feel less responsible because of the earlier verdict was offset by the subsequent arguments of both parties stressing the gravity of the jury's responsibility. This argument was not so extreme or manifestly improper that it could not have been cured by an instruction to disregard had appellant objected.

rebuttal, Dr. Nottingham, a psychiatrist, testified for the State that it was "not responsible" for a mental health professional to make a prediction of future violence in the context of a capital trial. Appellant complains of the following closing argument by the State:

[Prosecutor]: ... Mr. Dickerson, who according to Dr. Nottingham violated his professional ethics by standing up here and—

[Defense counsel]: Object. No grounds whatever in the record to support that assertion. We—(double voice)

The court sustained the objection and the jury was instructed to disregard the comment. Appellant's motion for a mistrial was overruled.

An improper jury argument can ordinarily be obviated by an instruction to disregard "unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment." *Bower v. State*, 769 S.W.2d 887, 907 (Tex.Crim.App. 1989), *overruled on other grounds, Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App. 1991); *see also Long v. State*, 823 S.W.2d 259 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Here, the prosecutor's comment, as interrupted by appellant's objection, was not a complete sentence. Further, the comment here is not in the nature of comments that we have held to be so inflammatory as to be incurable. Points of error forty-six and forty-seven are overruled.

■ In points of error fifty-two and fifty-three, appellant claims the trial court erred in overruling his motion to suppress evidence of weapons obtained in a warrantless search of appellant's automobile during its impoundment in police custody. Appellant claims the search violated his rights under the fourth and fourteenth amendments to the United States Constitution, and under the Texas Constitution, article one, section nine. The State contends appellant lacks standing to complain of the warrantless search.

Appellant leased the vehicle in question from a Ford dealer in Foley, Alabama on January 21, 1976. The lease required the vehicle to be returned on January 26, 1976. Evidence at the suppression hearing established the existence of a warrant, dated March 16, 1976, charging appellant with "larceny by trick" and charging that appellant "did take and carry away" the subject vehicle. The warrant was signed by a representative of the dealership which rented the car to appellant. The evidence also established that the vehicle was registered in name of the Ford Marketing Corporation, Foley, Alabama.

A defendant lacks standing to contest the search of a stolen vehicle. *Jackson v. State*, 745 S.W.2d 4, 8 (Tex.Crim.App.), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988); *Viduarri v. State*, 626 S.W.2d 749, 750 (Tex.Crim.App.1981). Any expectation of privacy appellant might claim in the stolen vehicle was not "one that society is prepared to recognize as 'reasonable' ".[27] *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979)). The trial court did not err in overruling appellant's motion to suppress. Points of error fifty-two and fifty-three are overruled.

■ In his final two points of error, fifty-four and fifty-five, appellant claims the trial court lacked jurisdiction because Judge Allen Stilley was not validly assigned to preside over his case and also because the case was not validly transferred from the 130th Judicial District Court to the 23rd Judicial District Court. Appellant argues that Judge Stilley, a "former judge", had no authority to preside over appellant's trial in the absence of "a valid assignment". Appellant further argues that because there is "not one shred of evidence in the record ... that [appellant's] prosecution was ever transferred to the 23rd, either formally or informally, orally or in writing, by express or tacit agreement, or by some process of judicial osmosis", the trial court lacked jurisdiction.

27. Appellant does not offer argument or authority on the issue of standing in his brief. Rather, he argues that "[t]he question is simply whether Appellant had a reasonable expectation of privacy in the locked interior of the trunk of his car that was protected by the federal and state constitutions, and that was unreasonably invaded without a warrant."

Appellant concedes that Judge Stilley served for a number years as the presiding judge of the 228th judicial district court of Harris County, Texas, and that, as a former judge, he was eligible for assignment. On April 27, 1987, Judge Thomas Stovall, the presiding judge of the 2nd Administrative Judicial Region, executed a document entitled Order of Assignment by the Presiding Judge, which provided, in part, as follows:

> Pursuant to Section 74.033, Tex. Gov't.Code, and Section 4.016, Article 200a–1, V.T.C.S, I hereby assign the Honorable Allen L. Stilley ... Former Judge of the 228th District Court ... [t]o the 23rd District Court of Matagorda County, Texas.
>
> ... This assignment is for the period beginning the 27th day of April, 1987, provided that this assignment shall continue after the specified period of time as may be necessary for the assigned Judge to complete trial of any case or cases begun during this period, and to pass on motions for new trial and all other matters growing out of cases tried by the Judge herein assigned during this period.
>
> ... Judge Stilley is hereby assigned to hear and determine to final conclusion the following case: 5,410; The State of Texas vs. Billy George Hughes, Jr. To be set at the convenience of the assigned Judge and all parties of interest.

Government Code sections 74.031 through 74.038, in effect on April 27, 1987, the date of Judge Stilley's assignment to the instant case,[28] governed the assignment of judges. Section 74.032 provided that former district judges were subject to assignment and section 74.033 provided that a presiding judge of an administrative district could assign judges to try cases. Tex. Gov't Code Ann. §§ 74.032, 74.033. None of the applicable statutory provisions prescribed a method for effectuating such an assignment. The Order given cited the controlling statutory provisions and specifically provided that Judge Stilley was assigned to hear appellant's case "to final conclusion". We hold the Order was sufficient to assign Judge Stilley to the instant case.

The Order assigned Judge Stilley "[t]o the 23rd District Court of Matagorda County, Texas." Because appellant's first trial was heard in the 130th District Court,[29] in the absence of a valid transfer to the 23rd District Court, appellant claims Judge Stilley had no authority to preside over the second trial. Appellant overlooks statutory authority to the contrary. Government Code section 24.124, *23rd Judicial District (Brazoria, Matagorda, and Wharton Counties)*, in effect at the time of Judge Stilley's assignment and also in effect at the time of appellant's trial one year later, provided, in relevant part, as follows:

> (c) *There is one general docket for the 23rd and 130th district courts in Matagorda County.* All suits and proceedings within the jurisdiction of the courts in Matagorda County shall be addressed to the district court of Matagorda County. All citations, notices, restraining orders, and other process issued in Matagorda County by the clerk or judges of the courts are returnable to the district court of Matagorda County without reference to the court number. On return of the process the judge of either court may preside over the hearing or trial. *The judges of the 23rd and 130th district courts in Matagorda County may hear and dispose of any mat-*

---

28. Effective September 1, 1987, these government code provisions were amended and renumbered. We note that the assignment at issue here would have been valid under the amendments as well.

    Article 200a–1, sections 4.001 et seq., were also applicable to assignment of district judges at the time of Judge Stilley's assignment to this case. Section 4.015 provided that former district judges were subject to assignment and section 4.016 provided that the presiding judge of an administrative district could assign judges to try cases.

29. Venue originated in Austin County in the 155th district court. However, prior to appellant's first trial, venue was transferred to the 130th district court of Matagorda County, where appellant's first trial took place. In reversing appellant's first conviction, we said "applicant is remanded to the custody of the Sheriff of Matagorda County to answer the indictment...." *Ex parte Hughes*, 728 S.W.2d 372, 375 (Tex.Crim. App.1987).

*ter on the court's general docket without transferring the matter.*

TEX. GOV'T CODE ANN. § 24.124(c) (emphasis added).[30] No transfer order was needed for Judge Stilley, assigned to the 23rd district court of Matagorda County, to hear and dispose of appellant's case in the 130th district court of Matagorda County. TEX. GOV'T CODE ANN. § 24.124(c). Points of error fifty-four and fifty-five are overruled.

Having found no reversible error in any of the points presented, we affirm the judgment of the trial court.

CAMPBELL, J., concurs in the result in accordance with my dissenting opinion in *Cook v. State,* 884 S.W.2d 485 (Tex.Crim.App. 1994), this day decided, and otherwise joins the opinion.

McCORMICK, P.J., and WHITE, J., join this note.

CLINTON, J., dissents.

---

**30.** Although this code section was amended in 1985 and again in 1991, it continues to provide that the 23rd and 130rd district courts of Matagorda County share one general docket and judges from these two district courts can hear and dispose of any matter on the courts' general docket without transferring the matter.