**AFFIRM; and Opinion Filed August 6, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

## No. 05-14-00830-CR
_____

**JOSE ANGEL GONZALEZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-81581-08**

# MEMORANDUM OPINION

Before Justices Fillmore, Myers, and Evans
Opinion by Justice Fillmore

A jury convicted Jose Angel Gonzalez of capital murder, and the trial court assessed punishment of life imprisonment without the possibility of parole.[1] Gonzalez's sole complaint on appeal is that he was egregiously harmed by the trial court's failure to limit the applicable conduct elements in the definition of "knowingly" in the jury charge. We affirm the trial court's judgment.

**Background**

Jessica Castaneda testified she met Gonzalez at the Wendy's restaurant where they both worked. She started dating Gonzalez in February 2007, and began living with him in March 2007. Castaneda's three daughters, Ad.C., D.C., and A.C. lived with the couple. In February

_____

[1] The judgment of conviction was signed on October 3, 2008. Based upon the record, the trial court determined Gonzalez's trial counsel failed to timely file a notice of appeal. *See Ex parte Gonzalez*, No. WR-81226-01, 2014 WL 2003091, at *1 (Tex. Crim. App. May 14, 2014) (per curiam) (not designated for publication). The court of criminal appeals found Gonzalez was entitled to file an out-of-time appeal. *Id.*

2007, Ad.C. was four years old, D.C. was three years old, and A.C. was two months old. Castaneda became pregnant with Gonzalez's child in March 2007.

Gonzalez was scheduled to work on July 8, 2007, but called in sick. According to Castaneda, she and Gonzalez argued about his failing to go to work, why he had called in sick, and her estranged husband's failure to provide enough support for the children. Castaneda was also scheduled to work that day, but had difficulty finding an acceptable babysitter. After their supervisor requested that Gonzalez watch the children, he "reluctantly" agreed to do so. Castaneda testified Gonzalez "did not seem very happy" about having to watch the children. According to Castaneda, A.C. was looking around, smiling, laughing, and playing during the day and was fine when Castaneda left for work at approximately 4:45 p.m.

Reuben Sanchez met Gonzalez in 2004 or 2005. Sanchez testified he did not see Gonzalez very often but, on July 4, 2007, Gonzalez, Castaneda, and A.C. came by his house. Sanchez was thinking of leaving his wife, and he discussed with Gonzalez the possibility of temporarily living with Gonzalez and Castaneda. Gonzalez called Sanchez on July 8, 2007, told Sanchez he was not going to work, and asked Sanchez to come to his apartment. Sanchez and his brother arrived at Gonzalez's apartment at approximately 6:30 p.m. Gonzalez's mother and brother were at the apartment when Sanchez arrived, but left approximately forty-five minutes later.

Gonzalez showed Sanchez the second bedroom in the apartment, which was being used by Ad.C. and D.C. The bedroom window had been covered by a sheet attached to the window frame with screws. There was also a lock on the outside of the bedroom door. Gonzalez told Sanchez the door and window were secured to ensure the girls would not get out of the room.

Sanchez, his brother, and Gonzalez sat in the living room, talking, watching TV, and drinking beer. Ad.C. and D.C. were in their bedroom, and A.C. was in the master bedroom.

–2–

Sanchez testified that Castaneda and Gonzalez were arguing on the phone, and Gonzalez seemed angry. Gonzalez complained that Castaneda "kept bothering him" and wanted him to go work. Gonzalez also mentioned that he went to the children's father's place of employment and the two men had a "face-off." To Sanchez, it appeared that Gonzalez felt the children were a burden.

At approximately 8:30 p.m., Sanchez's brother indicated he needed to go home. According to Sanchez, his brother had been with him the entire time at the apartment and had not had any access to A.C. at that time. Because the toilet in the hall bathroom was clogged, both Sanchez and his brother used the restroom in the master bedroom before they left. Sanchez testified he did not see A.C., but heard her while he was using the restroom. The restroom door made a creaking sound when he opened it, and A.C. cried briefly.

Sanchez took his brother home, went by Wendy's to get some food and a plunger from Castaneda, and returned to Gonzalez's apartment. Gonzalez gave some food to Ad.C. and D.C., and they went back into their bedroom to eat. The two men were unable to unclog the toilet in the hall bathroom and returned to the living room to eat their food. After eating, the two men talked a while and then went out onto the patio to smoke a cigarette.

Gonzalez's phone rang, and he went inside. Around 11:00 or 11:30 p.m., Sanchez called his brother to ask whether he could borrow some money for beer and gas. Sanchez needed to leave Gonzalez's apartment soon because he could not buy beer after 12:00 a.m. Sanchez called out Gonzalez's name, and Gonzalez opened the door to the master bedroom just wide enough to squeeze out, shut the door behind him, and stood by the door. As Sanchez left, he asked Gonzalez if he was going to lock the front door. Gonzalez remained standing by the door to the master bedroom and said to leave the front door unlocked. Sanchez went to his brother's house and then to a store to purchase beer.

After buying the beer, Sanchez returned to Gonzalez's apartment and knocked on the door. When there was no answer, he opened it and saw Gonzalez walking quickly from the direction of the master bedroom. The two men went into the living room and talked for a little while. Then Gonzalez began having an argument with someone on the phone and went back into the master bedroom. When Gonzalez came back into the living room he said something in Spanish to Sanchez that translates into, "I fucked up." Sanchez thought Gonzalez had made Castaneda angry.

Esteban Villarreal testified that Gonzalez called him at 12:22 a.m. on July 9, 2007, and asked him for a ride. Villarreal did not know where Gonzalez wanted to go. Villarreal told Gonzalez that he had drunk a couple of beers and could not go out. Gonzalez sounded agitated and told Villarreal there had been an accident.

The log of calls made from Gonzalez's cell phone indicates he called Wendy's at 1:02:15 a.m. Sanchez testified Gonzalez began talking "pretty loud" on the phone. Sanchez had planned to spend the night at the apartment, but decided he did not want to be there when Castaneda came home. Sanchez called his wife at 1:04 a.m. to see if she or his children were hungry. Sanchez tried to get Gonzalez's attention, but Gonzalez was still talking on the phone and would not look at him. Sanchez left the apartment, bought some food at Whataburger, and went home. The receipt from Whataburger shows Sanchez purchased the food at 1:17 a.m. The phone log from Gonzalez's cell phone shows he called Sanchez at 1:19:43 a.m., 1:19:46 a.m., 1:55:39 a.m., 1:56:08 a.m., 1:56:19 a.m., and 1:56:49 a.m. Sanchez remembered Gonzalez calling him twice during that time period but, because he was eating, he did not answer the calls.

Castaneda testified Gonzalez called her again at approximately 2:30 a.m., a time verified by the log of Gonzalez's cell phone calls. Gonzalez sounded a little agitated and asked what time she would be home. She told him it would be a little longer because they were running late.

Gonzalez asked Castaneda to bring him a salad. Gonzalez did not tell Castaneda that anything was wrong with A.C.

Gonzalez called 911 at 2:43:57 a.m. and reported that A.C. was not breathing and her head and feet were cold. Castaneda came home shortly thereafter and saw Gonzalez in the master bedroom on his knees. Gonzalez was saying, "where are you" and "I've been calling for an hour." Castaneda looked down and saw that A.C. was very pale and was not breathing. A.C.'s eyes were "blank" and rolling toward the back of her head and the side of her head was swollen. Gonzalez threw his cell phone against the wall, and then called 911 again on the "house phone." As Castaneda began to perform CPR on A.C., the police and the paramedics arrived. A.C. was immediately taken to the hospital.

Gonzalez spoke with multiple police officers after A.C. was taken to the hospital and after he was arrested. Although the details of what occurred, such as the order of events and what caused Gonzalez to check on A.C. differed in these accounts, Gonzalez indicated he checked on A.C. and discovered her diaper was wet. He removed her from the crib and placed her on the floor. A.C.'s eyes rolled back into her head, she began to turn purple, and he determined she was not breathing. He then called 911. Gonzalez denied hurting A.C. There was testimony from various officers that Gonzalez did not ask about A.C.'s condition, seemed detached from all the children, specifically stated he was not the biological father of the children, and was critical of Ad.C's and D.C's behavior. There was also evidence there were no toys in Ad.C. and D.C.'s bedroom and that, although the rest of the apartment was clean, that bedroom was dirty and reeked of urine.

Dr. Richard Honaker testified he was working in the emergency room at Medical Center of Plano (MCP) when A.C. was admitted at 3:11 a.m. A.C. had no vital signs at that point and had to be resuscitated. Both sides of A.C.'s head were very swollen, soft, and mushy. A CAT

scan showed A.C. had complex fractures on both sides of her skull. Based on the fractures, Honaker believed A.C. would have exhibited symptoms such as unconsciousness, vomiting, and not eating or drinking immediately following the injury. In Honaker's opinion, A.C.'s injuries were caused by a major force delivered to her skull, were not caused by an accident, and were inflicted within two to four hours of her arrival at the hospital. Because MCP does not have a neonatal intensive care unit, A.C. was transferred to Children's Medical Center Dallas (Children's) after she was stabilized.

Dr. Matthew Cox, a child abuse pediatrician, examined A.C. at Children's. A.C. was comatose and not breathing on her own. A.C. had severe skull fractures, swelling of her brain, bruising to her eyelids, and a broken right arm. The fractures of A.C.'s skull involved three different areas of her head, the left and right parietal bones and the occipital bone in the back of her head. Further, the fractures crossed two suture lines, or the division between the bones, a feature only seen with the most severe blows to the head. Typically a fracture caused by a blow to one side of the head will stop when it reaches the suture line because the force is dissipated by the suture line.

According to Cox, because the occipital bone is the thickest skull bone and is protected somewhat by the muscular tissue in the neck, it is the hardest bone to break. It is not the kind of bone that fractures from a simple fall. However, the most severe of A.C.'s fractures involved the back of her head. There were multiple fracture lines in the occipital bone and some of those fractures extended into the left and right parietal bones. There were also complicated fractures in both parietal bones. In Cox's opinion, A.C. had among the most severe skull fractures he had ever seen. To cause this degree of injury, there must have been repeated impacts by A.C.'s head to a hard surface.

Based on the severity of A.C.'s head injuries, Cox believed she exhibited symptoms within minutes to a few hours after the trauma. The symptoms could start with vomiting, lethargy, or irritability, but would quickly progress to a coma. In Cox's opinion, A.C. would have acted differently immediately after the event, and he believed her injuries happened within two or three hours of being admitted to MCP.

A.C. died after she was removed from life support. According to Dr. Keith Pinckard, the medical examiner who performed the autopsy, A.C. had the most severe inflicted head trauma he had ever seen. In his opinion, there were four blunt force injuries to A.C.'s head and A.C. died from those injuries.

Gonzalez testified that, on July 8, 2007, he woke up around noon because A.C. was crying. According to Gonzalez, it was not a "normal cry." Gonzalez bought some beer and began drinking. He decided to call in sick to work because he was drinking. Castaneda was scheduled to work and "the decision was made" that Gonzalez would watch the children. Gonzalez admitted he was not "really happy about it."

Sanchez and his brother came to the apartment about 6:15 p.m. According to Gonzalez, Sanchez and his brother each had a twenty-four ounce beer in his hand, and Sanchez's brother had a case of twenty-four ounce beers. Sanchez and Gonzalez discussed Sanchez moving into the apartment. Gonzalez gave A.C. a bottle at approximately 8:00 p.m., and A.C. was awake and fine at that time.

At some point, Sanchez took his brother home and returned with some clothes and hygiene items. Sanchez also had food from Wendy's for the children and a six-pack of twenty-four ounce beers. Sanchez later left to borrow money from his brother and bought more beer. According to Gonzalez, Sanchez returned to the apartment shortly after 12:00 a.m. The men watched television for a little while and then went out onto the patio. Gonzalez testified that

Sanchez was arguing with his wife through phone calls and text messages. Gonzalez admitted he had been arguing with Castaneda earlier, but claimed they had resolved the conflict. He testified he told Sanchez, in Spanish, that "I fucked up," because he had made Castaneda angry and possibly affected her blood pressure and her pregnancy.

At approximately 12:30 a.m., the men ran out of beer, and Gonzalez called Villarreal. Gonzalez told Villarreal there had been an accident because he thought that was the only way to convince Villarreal to come to the apartment with more beer. Gonzalez testified it was just a coincidence that he fabricated a story about an accident on the same night that something happened to A.C.

According to Gonzalez, Sanchez used the restroom in the master bedroom many times during the evening. At one point, Sanchez went into the bedroom for a "long period of time." The two men then ate some food and went outside to smoke a cigarette. Gonzalez went into the master bedroom to use the restroom and, when he came out, Sanchez and all his belongings were gone. Gonzalez tried to call Sanchez a number of times to ask why he left.

Gonzalez called Castaneda at 2:30 a.m. to find out when she would be home and to ask her to bring some food. He then took the television into the bedroom because he wanted Sanchez to have some privacy if he came back. Gonzalez had not "really" checked on A.C. since 8:00 p.m. Gonzalez testified he was watching television when he heard A.C. make a sound. Gonzalez checked on A.C. and saw she was "just looking up." Gonzalez said, "where's the baby, where's the baby," but A.C. did not respond. A.C.'s diaper was wet, so he took her out of the crib, placed her on the floor, and removed the wet diaper. Gonzalez went into the closet to get a clean diaper. He heard A.C. make the "same noise" and then her eyes started rolling back into her head. A.C.'s face began turning purple, and Gonzalez determined she was not breathing. He then called 911. Gonzalez denied he caused A.C.'s injuries.

Gonzalez claimed that, at trial, he recalled more details of what happened than he had recalled when questioned by the police after A.C. was taken to the hospital and after he was arrested. Gonzalez did not see Sanchez hurt A.C. but, because of the way Sanchez left the apartment, thought he must have done so. Gonzalez admitted he wrote letters while he was in jail suggesting that either Castaneda or Ad.C. and D.C. could have hurt A.C.

The jury convicted Gonzalez of capital murder. Because the State did not seek the death penalty, the trial court assessed punishment of life imprisonment without the possibility of parole.

## Discussion

In his sole issue on appeal, Gonzalez asserts the trial court included an erroneous definition of "knowingly" in the jury charge. Gonzalez did not object in the trial court to the charge submitted to the jury.

### Standard of Review

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally

affecting a defensive theory. *Villarreal*, 453 S.W.3d at 433. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). We assess harm in light of "(1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Id.* (citing *Almanza*, 686 S.W.2d at 171).

*Analysis*

Gonzalez argues capital murder is a result-of-conduct offense and, as such, the trial court erred by failing to limit the definition of "knowingly" in the jury charge to the applicable conduct element. Gonzalez asserts he was egregiously harmed by the error because the definition "expanded the theory" upon which he could be convicted.

The trial court instructed the jury that a person commits murder if he intentionally or knowingly causes the death of an individual and commits capital murder if he murders an individual under six years of age.[2] The trial court further instructed the jury that:

> A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.
>
> A person acts knowingly, or with knowledge, with respect to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

"Section 6.03 of the Texas Penal Code sets out: four culpable mental states–intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements–nature of the

---

[2] At the time the offense was committed, section 19.03 of the penal code provided that a person committed capital murder if he committed murder, as defined by section 19.02(a)(1) of the penal code, and the person murdered an individual under six years of age. Act of May 28, 1993, 73d Leg., R.S., ch. 887, § 1(a)(7), 2003 Tex. Gen. Laws 3529, 3529. In 2011, section 19.03 of the penal code was amended to provide that a person commits capital murder if he commits murder as defined by section 19.02(b)(1) of the penal code, and the person murders an individual under ten years of age. *See* Act of May 28, 2011, 82d Leg., R.S., ch. 1209, § 1(a)(8), 2011 Tex. Gen. Laws 3235, 3236 (codified at TEX. PENAL CODE ANN. § 19.03(a)(1)(8)).

–10–

conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price*, 457 S.W.3d at 441; *see also* TEX. PENAL CODE ANN. § 6.03 (West 2011). The gravamen of the offense is utilized to determine which conduct elements should be included in the culpable mental-state language of the jury charge. *Price*, 457 S.W.3d at 441. If the gravamen of the offense is the result of conduct, the jury charge definitions of culpable mental states should be tailored to the result of conduct. *Id.* A trial court errs by failing to limit the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Id.*

Capital murder may contain both result of conduct and nature of conduct elements, depending on the underlying conduct which elevates the murder to capital murder. *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008); *Hughes v. State*, 897 S.W.2d 285, 295 (Tex. Crim. App. 1994); *see also Ex parte Castillo*, No. PD-0545-14, 2015 WL 3486960 at *5 n.14 (Tex. Crim. App. June 3, 2015). In this case, the offense was elevated to capital murder based on the age of the victim and is only a result-of-conduct offense. *See Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012) (capital murder based on murder of two-year-old child was result-of-conduct offense); *see also Fleming v. State*, 455 S.W.3d 577, 582 (Tex. Crim. App. 2014), *cert. denied*, 135 S. Ct. 1159 (2015) (capital murder statute does not contain a *mens rea* as to age of victim); *Black v. State*, 26 S.W.3d 895, 897–98 (Tex. Crim. App. 2000) (per curiam).[3] Accordingly, the trial court erred by failing to limit the statutory definition of "knowingly" to the result of Gonzalez's conduct. *See Price*, 457 S.W.3d at 441; *Hughes*, 897 S.W.2d at 295.

In considering whether Gonzalez was egregiously harmed by the error, we first consider the entire jury charge. *See Almanza*, 686 S.W.2d at 171. "In assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we 'may consider the degree, if any, to which the culpable mental states were limited by the application

---

[3] *See also Velez v. State*, No. AP-76051, 2012 WL 2130890, at *27 (Tex. Crim. App. June 13, 2012) (not designated for publication).

portions of the jury charge.'" *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995) (quoting *Hughes*, 897 S.W.2d at 296); *see also Johnson v. State*, 416 S.W.3d 602, 612 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Here, the application paragraph of the jury charge read:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 9th day of July, 2007, in Collin County, Texas, the defendant, JOSE ANGEL GONZALEZ, did then and there intentionally or knowingly cause the death of [A.C.], an individual younger than six years of age, by causing the head of [A.C.] to strike against a floor, a crib, or an object unknown to the Grand Jury, then you will find the defendant guilty of the offense of Capital Murder as charged in the indictment.
>
> Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, that the defendant is guilty of Capital Murder as charged in the indictment, you will acquit the defendant of Capital Murder as charged in the indictment.

The application portion of the charge instructed the jury that in order to convict Gonzalez of capital murder, it was required to find beyond a reasonable doubt that Gonzalez intentionally or knowingly caused A.C.'s death. *See Patrick*, 906 S.W.2d at 492.[4] The application paragraphs are the "heart and soul" of the jury charge. *See Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012). "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013) (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not

---

[4] In *Patrick*, a capital-murder case, the court of criminal appeals concluded that, although the trial court erred by failing to limit the definitions of "intentionally" and "knowingly" to the appropriate conduct element,

> [r]eferring back to the definitions of culpable mental states, it is obvious that the "result of conduct" and cause the result language are the applicable portions of the full code definitions. We conclude that because the facts, as applied to the law in the application paragraph, pointed the jury to the appropriate portion of the definitions, no harm resulted from the court's failure to limit the definitions of the culpable mental states to proving the conduct element of the underlying offense.

*Patrick*, 906 S.W.2d at 493 (citations omitted).

–12–

egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999); *see also Crenshaw*, 378 S.W.3d at 466.[5]

In the absence of contrary evidence, we presume the jury followed the trial court's instructions in the application paragraphs of the charge. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) ("[W]e assume that the jury would follow the instruction as given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge."). Nothing in the charge in the case emphasized the inapplicable portion of the definition of "knowingly" that Gonzalez complains about, and the application paragraph properly placed the culpable mental states. *See Patrick*, 906 S.W.2d at 492; *Hughes*, 897 S.W.2d at 295; *Johnson*, 416 S.W.3d at 612–13; *Delgado v. State*, 944 S.W.2d 497, 499 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) ("Significantly, the 'nature of conduct' language used in the court's definition paragraphs was not repeated in the application paragraphs. We hold that this instruction appropriately limited the overbroad language used in the court's definitions, and pointed the jury to the proper issue to be resolved in a result-oriented offense."). We conclude this factor weighs against a finding of egregious harm.

The next factor is the "state of the evidence." *See Almanza*, 686 S.W.2d at 171. The evidence established that A.C. was injured by at least four major blows to her head and the injuries could not have been cause accidentally. The only disputed issue at trial was who caused the injuries. According to Honaker and Cox, A.C. was injured within two to four hours of her admission to MCP. During that time period, only Gonzalez and Sanchez had access to A.C. There was evidence that during the evening of July 8, 2007, Gonzalez was angry with Castaneda because her estranged husband did not provide adequate support for the children, was frustrated

---

[5] *See also Halton v. State*, No. 05-14-00640-CR, 2015 WL 3991827, at *9 (Tex. App.—Dallas July 1, 2015, no pet. h.) (mem. op., not designation for publication).

with Ad.C.'s and D.C.'s behavior, viewed the children as a burden, and did not want to be responsible for watching the children. According to Sanchez, he did not see A.C. that night, but heard her cry briefly as he used the restroom adjacent to the master bedroom. After Sanchez returned from buying beer shortly before midnight, Gonzalez said something in Spanish that translates to, "I fucked up." Gonzalez also called Villarreal at 12:22 a.m. and requested a ride because there had been an "accident." Sanchez testified that, although he planned to spend the night at Gonzalez's apartment, he decided to leave shortly after 1:00 a.m. when Gonzalez began acting strangely. After Sanchez left, Gonzalez called him six times in less than an hour. Sounding a "little agitated," Gonzalez called Castaneda at 2:30 a.m., asked when she was coming home, and requested she bring him a salad. Gonzalez did not tell Castaneda that something was wrong with A.C. and testified that A.C. was fine at 2:30 a.m. At 2:43 a.m. Gonzalez called 911 and reported A.C. was not breathing. He also reported that A.C.'s head and feet were cold. When Castaneda arrived, Gonzalez complained he had been calling 911 for an hour and threw his cellphone against the wall. After A.C. was taken to the hospital, Gonzalez did not seem concerned about her condition.

The trial court correctly instructed the jury regarding intentional murder, and there was sufficient evidence to support a conviction under that theory of the offense. Therefore, there was "at least one theory of the offense upon which [Gonzalez's] conviction may stand." *Medina*, 7 S.W.3d at 640. Accordingly, this factor does not weigh in favor of a conclusion Gonzalez suffered some actual, rather than theoretical, harm from the trial court's error in the definition of knowingly in the jury charge.

The third factor requires that we consider the arguments of counsel. *See Almanza*, 686 S.W.2d at 171. The State's closing argument focused on the severity of A.C.'s injuries and the evidence supporting a finding that Gonzalez caused those injuries. In the defense's closing

–14–

argument, counsel conceded that A.C. was murdered by multiple blunt force trauma and that "nobody is going to tell you it wasn't a crime, it was an accident. It was an intensional [sic] infliction." Counsel then focused on the identity of the perpetrator, setting out the facts that pointed to Sanchez. Defense counsel argued:

> Because as far as I'm concerned, there are two suspects. I want to do the whole trial over again and put Reuben Sanchez next to me and see how he does, see what he says. . . . He was there, he had the opportunity. He was mad at his wife, he was arguing with his wife.

Counsel argued the police did an inadequate investigation of Sanchez because, "They'd already formed an opinion. They'd already got their man." Defense counsel concluded,

> There is no doubt about what happened. There is no doubt about how it happened and there is no don't [sic] about the outcome for that poor baby. The doubt is, which guy did it? Because they were both there. There were only two of them there. I'm asking you to go back and find him not guilty.

The State did not erroneously argue the culpable mental state necessary for the charged offense. Rather, the closing argument of both parties focused on the identity of the perpetrator. We find nothing in the closing arguments to indicate Gonzalez suffered some actual, rather than theoretical, harm from the erroneous definition of knowingly in the jury charge.

We finally must consider any other relevant information revealed by the record as a whole. *Almanza*, 686 S.W.2d at 171. We have reviewed the entire record and have found no other relevant information that requires our consideration.

On this record, we conclude the trial court's error in failing to limit the definition of "knowingly" to the applicable conduct element of the offense in the abstract portion of the jury charge caused no actual, as opposed to theoretical, harm to Gonzalez.

–15–

We resolve Gonzalez's sole issue against him and affirm the trial court's judgment.


                                    /Robert M. Fillmore/

                                    ROBERT M. FILLMORE

                                    JUSTICE


Do Not Publish
Tex. R. App. P. 47

140830F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOSE ANGEL GONZALEZ, Appellant

No. 05-14-00830-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas,
Trial Court Cause No. 380-81581-08.
Opinion delivered by Justice Fillmore,
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 6th day of August, 2015.