**Opinion issued May 1, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00507-CR

———————————

**LADAMION LAMOND MAJORS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 54th District Court**
**McLennan County, Texas**
**Trial Court Case No. 2020-294-C2**

---

## MEMORANDUM OPINION

A jury convicted Ladamion Lamond Majors of the first-degree felony offense

of aggravated robbery.[1] *See* TEX. PENAL CODE § 29.03(a)(3)(A), (b). Majors pleaded

---

[1]     Pursuant to its docket-equalization authority, the Texas Supreme Court transferred
        this appeal from the Tenth Court of Appeals to this Court. *See* Misc. Docket No. 22-
        9050 (Tex. June 30, 2022); TEX. GOV'T CODE § 73.001(a) (authorizing transfer of

true to two enhancement paragraphs, and the jury assessed his punishment at life imprisonment. *See id.* §§ 12.32(a), 12.42(c)(1), (d). In two issues on appeal, Majors contends that the trial court reversibly erred by submitting a jury charge that: (1) did not tailor the culpable mental states to the three conduct elements present in the offense of aggravated robbery; and (2) did not define "accomplice" or provide a multiple-accomplice instruction. The State agrees that the charge was erroneous for these reasons but disagrees that these errors were harmful. We affirm.

## Background

S.J. "Sunny" Embery, the complainant, met Lakeisha Price online in 2019. He lived in Georgia, and she lived in Hewitt, Texas. Embery began developing romantic feelings toward Price, and he moved to Hewitt to live with her in December 2019. He signed a lease on a house, and Price and her two children moved in with him. Embery was eighty years old, and Price was in her late thirties.

Embery testified that on New Year's Eve 2019, about a week after moving in with Price, he was at home when the doorbell rang. He went to answer the door, but Price rushed to the door, knocked Embery's hand off the door handle, and opened it herself. Majors, Iriana Rutledge, and Rutledge's two minor children were at the door. Embery did not know them. Price had previously dated Majors, but she introduced

---

cases). We are unaware of any conflict between the precedent of that court and of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

2

him and Rutledge to Embery as her cousins. She told Embery that they were going to stay at Embery's house for a while.

Soon after the guests arrived, Majors and Embery were alone on the back patio when Majors asked Embery if he wanted to meet and sleep with another woman and have an orgy. Embery declined and said he was "cool" with Price. When they returned inside, Majors would not let Embery talk to Price or get near her.

Majors and Price left Embery's house soon after to buy whiskey. They returned about two hours later and asked Embery to drink with them, but he declined, prompting Majors to call him a "sissy." Majors then said that they were leaving but would return. He left with Price, Rutledge, and Rutledge's two children while Embery stayed home alone.

Majors, Price, and Rutledge returned to Embery's house around dusk. Embery opened the front door and, as he did so, Majors immediately confronted Embery, asking what he had told Price. Majors got behind Embery and grabbed him. Embery laughed because he believed Majors was kidding. He told Majors that he did not tell Price anything, but Majors called him a liar. So Embery said that he had told Price "just what you [Majors] asked me, about another woman for me." Majors then "started it." He pushed Embery against a wall. As Embery fell, Price and Rutledge grabbed him by the arms, and Majors hit him on the side of his head with "a hard

lick."[2] Embery was dazed, but he refused to go down because he was afraid for his life.

When he hit Embery, Majors asked him, "Where's my $500 at?" Embery asked, "What $500?" Majors responded, "You owe me $500," but Embery said he did not owe Majors anything. Majors again demanded $500 from Embery. Price told Embery that he was "gonna give [Majors] the $500. Make it easy on yourself." Embery asked why he would give Majors $500, and Majors said, "[Y]ou and me made a deal, $500 to have sex with my girl." Embery said, "Man, there ain't no woman in the world I'd pay $500 for no sex."

Majors went outside and "came back in with a shotgun wrapped up in a blanket." As he removed the shotgun from the blanket, Embery grabbed the blanket, it came off the shotgun, and Majors "threw the shotgun up." Price grabbed the barrel of the gun and told Majors to put it down. Majors put the gun on the floor and "ran into [Embery] again," causing Embery to fall to the floor. Embery was dazed and could not get up. But he was a former Marine, so he decided to defend himself like he had learned in the service. When Majors tried to hit him again, Embery reached up, grabbed Majors' head, and pulled it down to his chest. Holding Majors on top of him, Embery "[tried] to suffocate" Majors, and Majors "couldn't breathe." Embery

---

[2] Embery testified that he was unsure whether Majors hit him with his fist or with the butt of a shotgun.

"just started squeezing on him. And [Majors] started kicking." Realizing Majors could not breathe, Price and Rutledge told Embery he was going to kill Majors, so they pried Embery's hands loose. The fight ended, and Embery got up from the floor.

Embery announced that he was going to call the police and grabbed his cell phone, but Price said he was not going to call the police. She knocked the phone out of his hand and took it. Embery went into the garage and got inside his van. He heard Majors tell Price and Rutledge to stop him, so they followed him into the garage. Embery locked the door, started the van, and drove off while Price and Rutledge were "still hanging on the van." Embery drove to a nearby Walmart, and a store manager called the police for him.

Hewitt Police Officers Yasmin Rahim and Michael Ordonez responded to the call and met Embery in the Walmart parking lot. Rahim and Ordonez testified that they observed a large contusion on the side of his head that was bruised and swollen. They also saw minor cuts and bruises on his arms and wrists. The officers took Embery to the police station, where they photographed his injuries and obtained a written statement. The photographs and the written statement were admitted into evidence at trial. Embery testified that he hurt for a couple months after the incident.

Embery also identified Majors and Price from their driver's license photographs, and he identified a red car that Rutledge was driving. The officers asked Embery to stay at a hotel for the night out of concern for his safety, but Embery

5

declined. So the officers escorted him home and searched the house to make sure no one was there. They also decided to conduct additional patrols around Embery's house that night.

Around 5 a.m. the following morning on New Year's Day, Hewitt Police Sergeant Stephen Cooney was patrolling near Embery's house. He saw Rutledge's red car arrive at Embery's house, and he recognized Majors, Price, and another woman—later identified as Rutledge—try to go in the front door of Embery's house. Cooney requested backup and approached the three suspects. Majors, Price, and Rutledge initially refused to comply with Cooney's orders to lie on the ground, but Cooney was eventually able to arrest them. When backup officers arrived, Cooney searched Rutledge's car and found Majors' shotgun unloaded and wrapped in a blanket in the trunk.

Embery awoke around 6 a.m. to red lights outside his house. He went outside and saw that policed had arrested Majors, Price, and Rutledge and had confiscated the shotgun. Police officers also confiscated five or six phones on the three suspects. Embery found his phone, which Price had taken from him, and police let him have it. Embery moved back to Georgia that day "when the daylight came." He later tried to reconcile with Price, but he realized he made a mistake when she "tried to proposition [him] out of some more money."

At some point, Embery wrote a letter to Price's attorney stating that he did not believe Price was involved in the incident but instead had tried to save his life. The letter was not admitted into evidence, but Embery testified that he wrote the letter to minimize Price's involvement in the incident because he still had feelings for her. He later realized, however, that Price was not helping him because she only grabbed Embery while Majors attacked him. If she had been trying to save him, she also would have grabbed Majors. He realized that she was attacking him and trying to hurt him, she and Rutledge scratched his wrist, and she took his phone and tried to stop him when he got in his van. He clarified at trial that Majors had hit him in the head.

In February 2019, Majors was indicted for the first-degree felony offense of aggravated robbery. The indictment alleged that Majors, "while in the course of committing theft of property and with intent to obtain or maintain control of the property, intentionally, knowingly, and recklessly cause[d] bodily injury to S.J. Embery, a person 65 years of age or older, by grabbing or kicking or striking or pushing him." The indictment contained two enhancement paragraphs alleging that Majors had been finally convicted of two prior felonies: aggravated assault and assault on a public servant. Majors was arrested pursuant to an arrest warrant.

Price and Rutledge were also arrested and indicted as accomplices. However, the State dismissed the charges against them in exchange for their testimony against Majors.

At trial, Embery, Price, Rutledge, and the three police officers—Rahim, Ordonez, and Cooney—testified as witnesses. Neither Majors nor the State objected to the jury charge.

The jury found Majors guilty of aggravated robbery. During the punishment phase, Majors pleaded true to both prior felony convictions alleged in the enhancement paragraphs. The jury sentenced Majors to life imprisonment. He did not file any post-judgment motions. This appeal followed.[3]

## Jury Charge

In two issues on appeal, Majors contends that the trial court erred by submitting erroneous jury charge instructions.[4]

---

[3]   Majors' initial appointed appellate counsel filed an *Anders* brief in this Court arguing that the appeal is wholly frivolous, and counsel moved to withdraw. *See Anders v. California*, 386 U.S. 738, 744 (1967). We reviewed the record and determined that nonfrivolous issues may exist. *See id.* We struck the *Anders* brief, granted the motion to withdraw, abated the appeal, and remanded the case to the trial court to appoint new appellate counsel. *See id.*

[4]   In addition to raising these two issues, Majors' appellate brief includes an *Anders* analysis arguing that no additional issues of reversible error exist in the record. According to Majors, the Tenth Court of Appeals from which this appeal originated requires this additional analysis even when an appellant raises issues of reversible error. *See* TEX. R. APP. P. 41.3. We disagree. *See Cummins v. State*, 646 S.W.3d 605, 614 (Tex. App.—Waco 2022, pet. ref'd) (stating that appellant must file brief raising issue of reversible error or file *Anders* brief, and "nonreversible errors can

## A.    Standard of Review and Governing Law

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. Jury instructions must inform the jury of the applicable law and how to apply it to the facts adduced at trial. *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022).

Jury charges contain both abstract paragraphs and application paragraphs. *Id.* at 165. Abstract paragraphs "serve as a glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Id.* (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). Generally, an abstract instruction contains reversible error only when the instruction is an incorrect or misleading statement of a law that the jury must understand to implement the commands of the application paragraph. *Id.* (quotation omitted).

Application paragraphs, on the other hand, apply the "pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Id.* (quotation omitted). The application portion allows the jury to convict a defendant of a particular offense. *Crenshaw*, 378 S.W.3d at 466.

Appellate courts analyze claims of jury-charge error in two steps. *Alcoser*, 663 S.W.3d at 165. First, the court determines whether the charge contained error,

---

be raised in an *Anders* brief"). Because Majors raises issues of reversible error, we decline to address the *Anders* analysis on appeal.

9

regardless of whether the error was preserved. *Id.* If error exists, the court then determines whether the error caused the appellant harm. *Id.*; *see Hutch v. State*, 922 S.W.2d 166, 174 (Tex. Crim. App. 1996) ("A defendant is entitled to be convicted upon a correct statement of the law.").

Where, as here, the defendant did not object to the alleged jury charge error in the trial court, the defendant must demonstrate that any error caused "egregious harm." *Alcoser*, 663 S.W.3d at 165 (quotation omitted). To assess harm, we consider (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of the probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Id.* (quotation omitted).

A finding of egregious harm must be based on actual harm rather than theoretical harm. *Id.* (quotation omitted). Egregious harm is a difficult standard to meet, and the analysis is fact-specific. *Id.* Jury charge error causes egregious harm if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.* Neither party bears the burden to show harm. *Id.*

## B.    Conduct Elements

In his first issue, Majors argues that the jury charge was erroneous because the definitions of the applicable culpable mental states were not tailored to each

conduct element to which they applied. The State agrees that the mental-state definitions in the charge were erroneous, but it argues that the error was harmless.

Majors was charged with aggravated robbery. As relevant here, a person commits aggravated robbery if the person both commits robbery and causes bodily injury to another person who is 65 years of age or older. TEX. PENAL CODE § 29.03(a)(3)(A). A person commits robbery "if, in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 29.02(a)(1); *see id.* §§ 29.01(1) (defining "in the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft"), 31.03(a) (defining theft as unlawful appropriation of property with intent to deprive owner of property).

A conduct element is an element of the offense that criminalizes a defendant's conduct. *See McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989); *Fields v. State*, 966 S.W.2d 736, 739 (Tex. App.—San Antonio 1998), *rev'd on other grounds*, 1 S.W.3d 687 (Tex. Crim. App. 1999). Penal Code section 6.03 recognizes three conduct elements: nature of conduct; result of conduct; and circumstances surrounding conduct. TEX. PENAL CODE § 6.03; *see McQueen*, 781 S.W.2d at 603. A particular criminal offense "may contain any one or more of these 'conduct elements' which alone or in combination form the overall behavior which the

11

Legislature has intended to criminalize." *McQueen*, 781 S.W.2d at 603. "[I]t is those essential 'conduct elements' to which a culpable mental state must apply." *Id.*

A nature-of-conduct element refers to "specific acts [that] are criminalized because of their very nature" rather than a specified result, and the applicable "culpable mental state must apply to committing the act itself." *Id.*; *Hill v. State*, 265 S.W.3d 539, 542 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). A result-of-conduct element does not specify the nature of the conduct, which is inconsequential to the commission of the crime. *Hill*, 265 S.W.3d at 542. The unspecified conduct is "criminalized because of its result" and "requires culpability as to that result." *McQueen*, 781 S.W.2d at 603; *see Hill*, 265 S.W.3d at 542. A circumstances-surrounding-conduct element refers to "otherwise innocent behavior [that] becomes criminal because of the circumstances under which it is done," and "a culpable mental state is required as to those surrounding circumstances." *McQueen*, 781 S.W.2d at 603; *see Hill*, 265 S.W.3d at 542.

Section 6.03 also recognizes four culpable mental states applicable to criminal offenses. TEX. PENAL CODE § 6.03. Three of the culpable mental states are relevant here: acting intentionally, acting knowingly, and acting recklessly. *See id.* § 6.03(a)–(c). Section 6.03 defines these culpable mental states by reference to the various conduct elements:

> (a)     A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his

conscious objective or desire to engage in the conduct or cause the result.

(b)   A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

(c)   A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.*

The abstract portion of a jury charge must include definitions of the culpable mental states relevant to the charged offense, and the definitions must be tailored to the applicable conduct elements of the offense. *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *Hill*, 265 S.W.3d at 541–42. Even if the charged offense contains all three conduct elements, a trial court errs if it does not limit each mental-state definition to the applicable conduct element. *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *Herrera v. State*, 527 S.W.3d 675, 678 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

13

Aggravated robbery contains all three conduct elements: causing bodily injury is a result-of-conduct element;[5] unlawful appropriation is a nature-of-conduct element; and requiring that an injury occur in the course of committing a theft is a circumstances-surrounding-conduct element. *Herrera*, 527 S.W.3d at 678; *Sutton v. State*, No. 01-07-00776-CR, 2008 WL 5102374, at *6 (Tex. App.—Houston [1st Dist.] Dec. 4, 2008, pet. ref'd) (mem. op., not designated for publication).

Here, the jury charge defined the three applicable culpable mental states—intentionally, knowingly, and recklessly—by quoting nearly verbatim their entire statutory definitions, which appear in the block quote above. *See* TEX. PENAL CODE § 6.03(a)–(c). The charge thus included all three conduct elements and specified which mental state applied to the various conduct elements:

- "Intentionally" applied to nature-of-conduct and result-of-conduct elements;
- "Knowingly" applied to nature-of-conduct, circumstances-surrounding-conduct, and result-of-conduct elements; and
- "Recklessly" applied to circumstances-surrounding-conduct and result-of-conduct elements.

As Majors acknowledges, the definitions thus correctly stated the law and tracked the statutory definitions of the culpable mental states.

---

[5] Majors does not address whether causing bodily injury to a person who is 65 years of age or older is a separate conduct element of the charged offense. *See* TEX. PENAL CODE § 29.03(a)(3)(A). Our research has not revealed any relevant authority on this point. We do not address this issue because it is unnecessary to our disposition. *See* TEX. R. APP. P. 47.1.

The mental-state definitions in the charge did not, however, state which culpable mental state applied to each conduct element involved in the offense of aggravated robbery. For example, Majors argues that a correct definition of the "causing bodily injury" element would have instructed the jury that this element is a result-of-conduct element and defined the applicable mental states accordingly. Thus, an example of an appropriate jury charge would read:

> The following definitions apply to the mental state in causing bodily injury:
>
> A person acts intentionally, or with intent, with respect to a result of his conduct when it his conscious objective or desire to cause the result.
>
> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
>
> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*See Herrera*, 527 S.W.3d at 679 (providing same example for culpable mental states of acting intentionally and acting knowingly); *see also Hughes v. State*, 897 S.W.2d 285, 296 n.16 (Tex. Crim. App. 1994) (providing similar example of charge limiting definitions of culpable mental states for charged offense of capital murder); *Fields*, 966 S.W.2d at 739. The charge should also provide similar instructions for the

15

remaining elements of the offense, applicable mental states, and applicable conduct elements. *Herrera*, 527 S.W.3d at 679.

We therefore agree with the parties that the jury charge contained error because it did not tailor the definitions of the applicable culpable mental states to indicate which conduct element applied to each element of aggravated robbery.

On appeal, Majors concedes that he did not object to the jury charge in the trial court, and thus the error is reversible only if he suffered egregious harm. *See Alcoser*, 663 S.W.3d at 165. Majors' entire argument concerning harm in this issue states: "This error permitted the jury to convict on an incorrect application of law." The State responds that the jury charge otherwise applied the mental states to the various conduct elements; the abstract portions of the charge properly defined terms relevant to the charged offense; the evidence supported the jury's finding that Majors committed aggravated robbery; and Majors' mental state was not in dispute at trial.[6]

---

[6] Alternatively, the State appears to argue that Majors waived this issue because he did not provide any argument or record citations showing how he was harmed by the mental-state instructions. Generally, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). The Court of Criminal Appeals has held that an appellant's failure to address harm resulting from jury-charge error constitutes inadequate briefing resulting in waiver of the issue. *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000). However, *Cardenas* was decided before the court decided *Warner v. State*, which clarified that "[t]o dispel any lack of clarity in our cases, we affirm that burdens of proof or persuasion have no place in a harm analysis" of jury charge error. 245 S.W.3d 458, 464 (Tex. Crim. App. 2008); *accord Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022) ("Neither party bears the burden to show harm."). At least one of our sister courts has questioned the validity of *Cardenas*, which "was decided [when] an

16

As stated above, when addressing harm, we consider the entire jury charge; the state of the evidence, including contested issues and the weight of the probative evidence; the argument of counsel; and any other relevant information provided by the trial record as a whole. *Id.*

### 1. Jury Charge as a Whole

When "assessing harm resulting from the inclusion of improper conduct elements in the definitions of culpable mental states, we may consider the degree, if any, to which the culpable mental states were limited by the application portions of the jury charge." *Hughes*, 897 S.W.2d at 296 (quotations omitted).

The application paragraph informed the jury that it could convict Majors if it found, among other elements, that he "intentionally, knowingly, or recklessly cause[d] bodily injury" to Embery "by grabbing or kicking or striking or pushing him." This is a result-of-conduct element. *Herrera*, 527 S.W.3d at 678. Each definition of the culpable mental states in the jury charge provided a definition corresponding to a result-of-conduct element. When these definitions are viewed in their factual context, it is apparent that causing bodily injury is a result-of-conduct

---

appellant arguably had the burden of persuasion to show harm on charge error. But that is no longer true." *Franklin v. State*, No. 02-23-00105-CR, 2024 WL 976800, at *1 n.2 (Tex. App.—Fort Worth Mar. 7, 2024, no pet.) (mem. op., not designated for publication) (relying on *Warner* and other cases). Neither party provides any legal authority or analysis concerning whether the Court should rely on Rule 38.1 and *Cardenas* or *Warner* and *Alcoser* in determining whether Majors waived error. Because the State's appellate brief addresses harm for this issue, we will consider it.

element. *See Hughes*, 897 S.W.2d at 296. "Intentionally," "knowingly," and "recklessly" directly modified "cause[d] bodily injury," and the jury could refer to the definitions of the culpable mental states and infer that the "result of conduct" and "cause the result" language in each definition of the culpable mental states were the applicable portions of the definitions. *See id.* Moreover, the application paragraph specifically described the manner and means of the committing the offense—"by grabbing or kicking or striking or pushing him"—which tends to limit the culpable mental states to the result of Majors' conduct. *See Ash v. State*, 930 S.W.2d 192, 195 (Tex. App.—Dallas 1996, no writ).

The application paragraph required the element of unlawful appropriation to occur "with intent to obtain and maintain control of the [unlawfully appropriated] property." This is a nature-of-conduct element. *Herrera*, 527 S.W.3d at 678. The intent definition provided that a person acts with intent "with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct." The abstract portion of the charge also defined "appropriation" as "to acquire or otherwise exercise control over property other than real property." Viewing these definitions in their factual context, it is apparent that unlawful appropriation is a nature-of-conduct element. In the application paragraph, "intent" directly modified "to obtain and maintain control" of stolen property. The definition of "appropriation" confirmed that acquiring or exercising control over property is

the gravamen of this element. The jury could infer that "nature of his conduct" and "conscious objective or desire to engage in the conduct" was the applicable portion of the definition of intent. *Cf. Hughes*, 897 S.W.2d at 296.

Finally, the application paragraph included the element of causing bodily injury while "in the course of committing theft." This element is a circumstances-surrounding-conduct element. *Herrera*, 527 S.W.3d at 678. The abstract portion of the charge defined acting "knowingly" with respect to circumstances surrounding conduct as being "aware . . . that the circumstances exist," and it defined acting "recklessly" with respect to circumstances surrounding conduct as being "aware of but consciously disregard[ing] a substantial and unjustifiable risk that the circumstances exist[.]" The abstract portion also defined "in the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." Viewing these definitions in their factual context, it is apparent that the "in the course of committing theft" element is a circumstances-surrounding-conduct element. *Cf. Hughes*, 897 S.W.2d at 296. The definition of "in the course of committing theft" clarified that this element applied to circumstances surrounding a theft, and the definitions of knowingly and recklessly likewise clarified that the relevant conduct element was the circumstances surrounding the theft.

19

Thus, viewing the jury charge as a whole weighs in favor of finding that no egregious harm resulted from the failure to tailor the mental state definitions to the applicable conduct elements of the offense. *See Alcoser*, 663 S.W.3d at 165 (stating that abstract instruction contains reversible error only when it contains incorrect or misleading statement of law that jury must understand to implement commands of application paragraph).

## 2. State of the Evidence and Counsel Argument

None of the contested issues at trial or the arguments of counsel focused on whether Majors acted with the requisite mental states. *See Herrera*, 527 S.W.3d at 680 ("The issue of appellant's mental state was not at all a focus of the trial or the closing arguments."); *Ash*, 930 S.W.2d at 195. Embery, Price, and Rutledge all consistently testified that Majors demanded $500 from Embery. When Embery refused and said he did not owe Majors any money, Majors punched Embery in the head and brandished a shotgun. Officers Rahim and Ordonez, who met Embery in the Walmart parking lot, testified that they observed injuries to Embery, including a swollen, bruised contusion on his head.

Defense counsel's cross-examination of the witnesses focused on establishing whether the officers interviewed Price after she was arrested, whether they searched Majors after he was arrested, whether Majors was trying to enter Embery's house before he was arrested, and whether the shotgun was loaded when police found it.

20

Defense counsel cross-examined Embery on whether Price attacked him, injured him, took his phone, and tried to stop him leaving in his van. Counsel cross-examined Price on her prior convictions and trustworthiness, whether a theft was completed, and whether she injured Embery. Counsel also established that Price was under the influence of drugs during the robbery attempt and that Rutledge was arrested on New Year's Day following the incident for her participation in the aggravated robbery and for possession of Ecstasy, a controlled substance. Defense counsel's examination of witnesses did not focus on whether Majors acted with the requisite mental culpability concerning the three conduct elements involved in aggravated robbery.

Moreover, defense counsel's closing argument made two primary points unrelated to Majors' mental culpability. First, counsel argued that Embery, Price, and Rutledge offered confusing testimony: "It was almost like three people were in a different place." Second, counsel argued that Majors did not commit a robbery at all because Price—not Majors—took Embery's phone. Defense counsel did not, however, address the testimony that Majors had demanded $500 from Embery. Rather, counsel agreed that Majors may have attempted to take something from Embery, but she argued that this attempt did not constitute the offense of aggravated robbery.

The State's closing argument summarized parts of the jury charge including the definitions of culpable mental states, but the State did not delineate the culpable mental states and conduct elements for each element of the charged offense. The State also argued that attempted theft is sufficient for an aggravated robbery offense.

Therefore, neither the trial evidence nor the argument of counsel focused on or disputed whether Majors acted with the requisite culpable mental states for each conduct element. Moreover, the State's case against Majors was strong, and Majors did not dispute that he attempted to steal $500 from Embery or that he punched Embery in the head when Embery refused to pay him. *See Campbell v. State*, 664 S.W.3d 240, 252 (Tex. Crim. App. 2022) (concluding that state of evidence weighed against finding of egregious harm because "State's case for guilt was exceedingly strong"); *Campbell v. State*, 227 S.W.3d 326, 331 (Tex. App.—Houston [1st Dist.] 2007, no pet) (concluding that state of evidence weighed against finding of egregious harm because testimony of defendant's assaultive actions was uncontradicted, and "the overwhelming weight of the evidence supported the jury's verdict"). Thus, these factors also weigh against a finding of egregious harm.

### 3. Other Relevant Information

Nothing in the appellate record indicates that the jury was confused by the charge, specifically the mental state definitions. *See Torres v. State*, 691 S.W.3d 138, 154 (Tex. App.—Austin 2024, pet. ref'd). During its deliberations in the guilt-

innocence phase, the jury sent four notes to the trial court. Two of the notes requested to review evidence, but none of the notes concerned the jury instructions. *See Murrieta v. State*, 578 S.W.3d 552, 556 (Tex. App.—Texarkana 2019, no pet) (noting that "the jury did not send any notes to the trial court regarding" challenged jury instructions); *Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd) ("There is no evidence the jury was confused about the instructions in the charge.").

We conclude that the appellate record does not establish that the erroneous failure to tailor the definitions of culpable mental states to the applicable conduct elements caused actual harm to Majors that affected the very basis of the case, deprived him of a valuable right, or vitally affected his defensive theory. *See Alcoser*, 663 S.W.3d at 165. We therefore hold that the charge error concerning the mental-state definitions is harmless.

We overrule Majors' first issue.

## C. Accomplice-Witness Instructions

In his second issue, which contains two sub-issues, Majors argues that the accomplice instructions were erroneous because they (1) omitted a definition of accomplice and (2) omitted a multiple-accomplice instruction prohibiting the jury from using one accomplice-witness's testimony to corroborate the other accomplice-witness's testimony. The State implicitly concedes that the charge erroneously

omitted a definition of accomplice and explicitly concedes that the charge erroneously omitted a multiple-accomplice instruction. The parties dispute whether the error caused harmed Majors.

"An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). An accomplice "must have engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Id.*

Texas law prohibits a conviction "upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. art. 38.14. This corroboration requirement reflects "a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Zamora v. State*, 411 S.W.3d 504, 509 (Tex. Crim. App. 2013) (quotation omitted). If the trial evidence raises an issue of a witness's status as an accomplice, the trial court must instruct the jury regarding the corroboration requirement because it is law applicable to the case. *Id.* at 513 (quotation omitted). The required jury instruction depends on the particular facts of each case. *Id.* at 510.

A witness may be an accomplice as a matter of law or as a matter of fact. *Id.* "A witness is an accomplice as a matter of law when the witness has been charged

with the same offense as the defendant or a lesser-included offense, or when the evidence clearly shows that the witness could have been so charged." *Id.* (quotations omitted). If the State charges a witness with the same or a lesser-included offense but dismisses the charges, the witness is no longer an accomplice as a matter of law unless the State dismissed the charges in exchange for the witness's testimony against the defendant. *Ash v. State*, 533 S.W.3d 878, 884 (Tex. Crim. App. 2017). If a witness is an accomplice as a matter of law, the trial court instructs the jury that the witness is an accomplice and that the accomplice's testimony must be corroborated. *Zamora*, 411 S.W.3d at 510.

By contrast, a witness is an accomplice as a matter of fact when the evidence is conflicting or inconclusive regarding the witness's complicity in the defendant's charged offense. *Id.* The jury must decide whether the witness is an accomplice and then apply the corroboration requirement accordingly. *Id.*

When multiple accomplices testify at trial, one accomplice's testimony cannot corroborate that of another accomplice. *Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971); *Taylor v. State*, 7 S.W.3d 732, 736 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); *see* TEX. CODE CRIM. PROC. art. 38.14 (prohibiting conviction based "upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed"). In this circumstance, the jury charge must instruct the jury that it cannot use one

25

accomplice's testimony to corroborate another accomplice's testimony. *Aston v. State*, 656 S.W.2d 453, 454 (Tex. Crim. App. 1983); *Taylor*, 7 S.W.3d at 736.

### 1. Definition of Accomplice

In this case, the jury charge instructed the jury that Price and Rutledge were both accomplices as a matter of law, and the parties do not challenge this instruction. *See Ash*, 533 S.W.3d at 884. The parties agree that the charge did not define "accomplice" or indicate that Price and Rutledge had each engaged in affirmative acts promoting the aggravated robbery against Embery with the requisite mental state. *See Smith*, 332 S.W.3d at 439. Although the charge stated that Price and Rutledge were accomplices as a matter of law, it was important for the jury to fully understand that Price and Rutledge were not merely witnesses to the offense. Rather, they were active participants who had been charged with aggravated robbery, but the charges were dismissed in exchange for their trial testimony against Majors. *See Zamora*, 411 S.W.3d at 509 (emphasizing legislative determination that "accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person"). We conclude that it was error to omit a definition of accomplice tailored to the facts of this case. *See Zamora*, 411 S.W.3d at 510.

Majors does not provide any argument showing how he was harmed, much less egregiously harmed, by the omission of a definition of accomplice. The State

26

argues that the omission was harmless because the meaning of accomplice was clear from the charge's context, and counsel's argument cautioned the jurors to be vigilant of the corroboration requirement.

We disagree with the State that the meaning of accomplice was clear from the context of the charge. Nothing in the jury charge stated or implied that Price and Rutledge had been indicted for actively participating in the aggravated robbery with the requisite mental culpability but the indictments were dismissed in exchange for their testimony. *See Ash*, 533 S.W.3d at 884. Rather, the charge merely stated that based upon "the law of accomplice witness testimony," Price and Rutledge were accomplices as a matter of law, and their testimony therefore must be corroborated.

Nevertheless, during its closing argument, the State referenced the accomplice-witness instruction in the jury charge, reiterated that both Price and Rutledge were accomplices as a matter of law, and stated that "[t]hey both were indicted for the same offense as Ladamion Majors and so they are accomplices." Moreover, Price and Rutledge each testified that they had been indicted for aggravated robbery and that the indictments against them had been dismissed in exchange for their truthful testimony against Majors. Price also testified that she took Embery's phone from him during the incident, and Rutledge testified that both she and Price held Embery's arms down while Majors attacked him, which caused injuries to Embery's wrists or arms.

27

Reviewing the appellate record as a whole—including the entire jury charge, the state of the evidence, argument of counsel, and other relevant information—the jury possessed the requisite information to understand that Price and Rutledge were accomplices as defined by Texas law. *See id.* Accordingly, we conclude that the record does not show that Majors was harmed, much less egregiously harmed, by the charge's omission of an accomplice definition. *See Alcoser*, 663 S.W.3d at 165. We therefore hold that this charge error is harmless.

### 2.    Multiple-Accomplice Instruction

The jury charge also omitted a multiple-accomplice instruction prohibiting the jury from using one accomplice's testimony to corroborate the other accomplice's testimony. *See Chapman*, 470 S.W.2d at 660; *Taylor*, 7 S.W.3d at 736. The charge instructed the jury that Price was an accomplice as a matter of law and that her testimony must be "corroborated by other evidence tending to connect [Majors] with the offense charged." In separate paragraphs, the charge likewise instructed the jury that Rutledge was an accomplice as a matter of law and that her testimony had to be "corroborated by other evidence tending to connect [Majors] with the offense charged." But the charge did not prohibit the jury from using Price's testimony to corroborate Rutledge's testimony or vice versa. *See Aston*, 656 S.W.2d at 454; *Taylor*, 7 S.W.3d at 736. We conclude that the charge was erroneous for omitting this multiple-accomplice instruction.

Majors argues that omission of the multiple-accomplice instruction caused him egregious harm because only three witnesses testified about the offense—Embery, Price, and Rutledge—and "Embery's prior conflicting statements create[d] a credibility problem for his testimony." Thus, to convict him, the jury was required to rely solely on Price's and Rutledge's testimony. The State responds that Price's and Rutledge's testimony "essentially agreed with" and was therefore corroborated by Embery's testimony.

To assess whether the erroneous omission of a multiple-accomplice instruction caused reversible harm, we eliminate from our consideration the accomplices' testimony, examine the remaining trial evidence, and decide whether the remaining evidence tended to connect the defendant with the charged offense. *Chapman*, 470 S.W.2d at 660; *Taylor*, 7 S.W.3d at 737; *see* TEX. CODE CRIM. PROC. art. 38.14 (prohibiting conviction upon testimony of accomplice unless corroborated by other evidence "tending to connect" defendant to charged offense). "Tendency to connect" does not require that the corroborating evidence alone be legally sufficient to establish guilt. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) (stating that "accomplice-witness rule is not based upon federal or state constitutional notions of sufficiency").

Embery testified that he was eighty years old on New Year's Eve 2019 when Majors and Rutledge appeared at his home. Embery had never met Majors or

Rutledge, and Price introduced them to Embery as her cousins. While alone with Embery shortly after arriving, Majors propositioned Embery to meet another woman or have an orgy, but Embery declined because he liked Price. Soon after, Majors and Price left Embery's house to buy whiskey, and they returned about two hours later. When Embery refused to drink alcohol with them, Majors insulted Embery and decided to leave Embery's house with Price and Rutledge.

When they returned several hours later, Majors immediately confronted Embery by asking what he had told Price. Embery initially denied telling Price anything, but then he said that he told Price "just what you [Majors] asked me, about another woman for me." And then Majors "started it." He pushed Embery against the wall and, as Embery fell, Price and Rutledge grabbed Embery by his arms while Majors hit him with a "hard lick" on the side of his head, causing a "big knot." Majors then demanded $500 from Embery. Embery told Majors he did not owe him any money, but Majors demanded the money again. Price told Embery to give Majors $500 to "[make] it easy on" himself. Embery asked why he would give Majors $500, and Majors said because "you and me made a deal, $500 to have sex with my girl." Embery told Majors he would not pay $500 to sleep with any woman.

Majors then retrieved a shotgun from Rutledge's car and pointed it at Embery. At Price's demand, Majors put the gun down, but he attacked Embery again and caused Embery to fall on the floor. Embery defended himself, effectively ending

30

Majors' attack. Embery got his cell phone and said he was calling the police, but Price knocked his cell phone out of his hand, took the phone, and told Embery that he was not going to call anyone. Embery eventually went into the garage and entered his van, but Majors told Price and Rutledge to stop him. Their attempt to do so was unsuccessful. Embery drove to a nearby Walmart and called the police. Embery testified that the attack caused him significant pain that lasted for months.

Officers Rahim and Ordonez met Embery at Walmart. Both officers testified that they immediately noticed injuries on Embery, including bruising and swelling on his head. They took Embery to the police station, where they photographed his injuries and took a statement from him. The photographs and Embery's statement were admitted into evidence at trial. Embery also identified Rutledge's car and Majors and Price from their driver's license photographs. Embery declined the officers' request that he stay at a hotel for the night, so they escorted him home and searched the house to ensure Majors, Price, and Rutledge had left. After Embery went inside, officers set up additional patrols around Embery's house out of concern for his safety. Around 5 a.m. the following morning, Sergeant Cooney was patrolling near Embery's house when he saw Rutledge's car in Embery's driveway. Majors, Price, and Rutledge were trying to enter the front door of Embery's house. Cooney called for backup and arrested Majors, Price, and Rutledge. He also found the shotgun wrapped in a blanket in the trunk of Rutledge's car.

After eliminating from our consideration Price's and Rutledge's trial testimony, we conclude that the remaining trial evidence described above tended to connect Majors with the charged offense of aggravated robbery. *See Chapman*, 470 S.W.2d at 660; *Taylor*, 7 S.W.3d at 737; TEX. CODE CRIM. PROC. art. 38.14. Embery's testimony established that Majors attempted to steal $500 from him and, while in the course of committing theft and with intent to obtain control of the money, Majors caused bodily injury to Embery, a person over 65 years old. *See* TEX. PENAL CODE § 29.03(a)(3)(A); *see also id.* §§ 29.02(a)(1), 29.01(1), 31.03(a). The testimony of Officers Rahim, Ordonez, and Cooney, as well as the photographs they took of Embery's injuries and their recovery of the shotgun Majors used in the aggravated robbery, also tended to connect Majors to the offense.

We disagree with Majors that Embery's prior statements created a credibility issue that required the jury to convict him based solely on Price's and Rutledge's uncorroborated testimony.

The trial court admitted into evidence the written statement Embery provided to police officers on the night of the incident. The statement was generally consistent with his trial testimony. For example, Embery stated that Majors retrieved a shotgun covered in a blanket, pointed it at Embery, and put it down at Price's request before he pushed Embery against a wall and demanded $500. Embery refused, and Majors hit him in the head while Price and Rutledge held his arms. When Embery said he

32

was calling the police, Price took his phone and told him he was not calling anyone. He then went to his van. Price tried to stop him, but he was able to drive away to Walmart and call the police.

Embery's statement contained some minor inconsistencies with his trial testimony. For example, he stated that Majors demanded his van keys before going to get the shotgun. He also stated that Price or Rutledge kicked him in the left ribs while he lay on the ground after Majors attacked him. Embery did not testify about this injury, but Officer Rahim testified that Embery had complained of pain to his left ribs when she met him at Walmart. None of the inconsistencies in Embery's written statement concerned Majors' participation in the aggravated robbery or tended to undermine Majors' connection to the charged aggravated robbery. *See Chapman*, 470 S.W.2d at 660; *Taylor*, 7 S.W.3d at 737; TEX. CODE CRIM. PROC. art. 38.14.

Embery also testified that he had written a letter to Price's attorney minimizing her role in the incident. The letter was not offered into evidence at trial. But Embery testified that he wrote that he did not believe Price was involved in the incident but was instead trying to save him. He wrote the letter because he still had feelings for Price. But after he wrote the letter, he thought more about the incident and recalled that Price and Rutledge had only grabbed his arms. Because they did not also grab Majors, he doubted that Price was trying to help him. As with the minor

33

inconsistencies in his written statement to police, Embery's statements in the letter to Price's attorney did not concern Majors' involvement in the aggravated robbery or tend to undermine his connection to it.

Reviewing the appellate record as a whole, we conclude that the jury charge's omission of a multiple-accomplice instruction prohibiting the jury from using one accomplice's testimony to corroborate the other accomplice's testimony did not cause Majors egregious harm. *See Alcoser*, 663 S.W.3d at 165. We therefore hold that the charge error is harmless.

We overrule Majors' second issue.

## Conclusion

We affirm the judgment of conviction.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).